1  Julie Pesanti Sampson
   Registered Professional Reporter
2  PO Box 7496
   Great Falls, Montana  59406-7496
3  Phone:  (406) 498-3941
   Email:  fortherecord3@charter.net
4
   United States Official Court Reporter
5  _____

6              **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE DISTRICT OF MONTANA**
7                   **GREAT FALLS DIVISION**

8
   UNITED STATES OF AMERICA,      )
9                                 )
                    Plaintiff,  )      CR-16-09-GF-BMM
10                                )
      versus                      )
11                                )
   CHERYL LYNN LITTLE DOG,        )
12                                )
                    Defendant.  )
13 _____

14           **PARTIAL TRANSCRIPT OF PROCEEDINGS**

15                    **MOTION HEARING**
        **TESTIMONY OF SPECIAL AGENT MARK ZAHACZEWSKY**
16 **TESTIMONY OF DEPUTY UNITED STATES MARSHAL LOGAN BRYCE**

17         **BEFORE THE HONORABLE BRIAN M. MORRIS**
            **UNITED STATES DISTRICT COURT JUDGE**
18              **FOR THE DISTRICT OF MONTANA**

19             Charles N. Pray Courtroom
             Missouri River Federal Courthouse
20         United States District Court Great Falls
                 125 Central Avenue West
21               Great Falls, MT 59404

22                  **April 28, 2016**
                     **1:30 p.m.**
23

24
             Proceedings recorded by machine shorthand
25     Transcript produced by computer-assisted transcription

**APPEARANCE OF COUNSEL:**

**For the Plaintiff:**

Mr. Bryan T. Dake
Assistant United States Attorney
United States Attorney's Office - Great Falls
119 First Avenue North
Suite 300
P.O. Box 3447
Great Falls, MT 59403
(406) 761-7715 (Phone)
(406) 453-9973 (Fax)
Email: Bryan.Dake@usdoj.gov


Mr. Carl E. Rostad
Assistant United States Attorney
United States Attorney's Office - Great Falls
119 First Avenue North
Suite 300
P.O. Box 3447
Great Falls, MT 59403
(406) 761-7715 (Phone)
(406) 453-9973 (Fax)
Email:  Carl.Rostad@usdoj.gov


**For the Defendant:**

Ms. Roberta Cross Guns
Attorney at Law
P.O. Box 105
Ulm, Montana 59485
(406) 459-9550 (Phone)
(406) 459-9550 (Fax)
Email: rcrossguns@gmail.com

1

**INDEX:**

2

3

**TESTIMONY**

4

**WITNESS:**                                                          **PAGE:**

5

**SPECIAL AGENT MARK ZAHACZEWSKY:**

Direct Examination by Mr. Dake . . . . . . . . .          6
6    Cross-Examination by Ms. Cross Guns. . . . . . .         44
Redirect Examination by Mr. Dake . . . . . . . .         49

7

8    **DEPUTY UNITED STATES MARSHAL WILLIAM LOGAN BRYCE:**

Direct Examination by Mr. Dake . . . . . . . .          51
9    Cross-Examination by Ms. Cross Guns. . . . . . .         73
Redirect Examination by Mr. Dake . . . . . . . .         86
10   Recross-Examination by Ms. Cross Guns. . . . . .         88

11

12

**EXHIBITS**

13

**EXHIBIT:**        **DESCRIPTION:**                          **ADMITTED:**

14

Exhibit 1 – Wanted Poster. . . . . . . . . . .           12
15
Exhibit 3 – Recorded Interview – Little Dog. . .         42
16
Exhibit 2 – NCIC Criminal History – Gallardo . .         56
17

18

19

20

21

22

23

24

25

1 | **PROCEEDINGS**

2 | (Open court)

3 | (Defendant present)

4 | (The partial proceedings

5 | began at 1:35 p.m.)

6 | THE BAILIFF:  The United States District Court is

7 | back in session.

8 | THE COURT:  Please be seated.  Madam clerk, please

9 | call the next case on the Court's calendar.

10 | CLERK OF COURT:  This Court will now conduct a

11 | motion hearing in Cause Number CR-16-9-GF-BMM, United States

12 | of America versus Cheryl Lynn Little Dog.

13 | THE COURT:  Good afternoon, Mr. Dake.

14 | MR. DAKE:  Good afternoon, Your Honor.

15 | THE COURT:  Good afternoon, Mr. Rostad.

16 | MR. ROSTAD:  Your Honor.

17 | THE COURT:  Mr. Rostad, I understand you will just

18 | be eye-candy for this proceeding.

19 | MR. ROSTAD:  I am, Your Honor.  You know, I would

20 | rather have the youth, you know, get the experience.

21 | THE COURT:  I understand.

22 | All right.  Good afternoon, Ms. Cross Guns.

23 | MS. CROSS GUNS:  Good afternoon, Your Honor.

24 | THE COURT:  Good afternoon, Ms. Little Dog.

25 | THE DEFENDANT:  Good afternoon.

1    THE COURT:  We are here on a motion filed by Ms.

2  Little Dog to suppress evidence seized during -- or

3  discovered during the warrantless search of her house.  Mr.

4  Rostad, the government has filed a response to that motion,

5  and I think the burden is on the government to prove the

6  legality of the search.

7     Mr. Dake, I guess.  I should be directing to you.

8     MR. DAKE:  It is, yes, Your Honor.

9     THE COURT:  Okay.  Do you want to call your first

10  witness?

11    MR. DAKE:  Thank you.  The United States calls

12  Special Agent Mark Zahaczewsky from the FBI.

13    CLERK OF COURT:  Please raise your right hand.

14  (The witness was duly sworn.)

15    THE WITNESS:  I do.

16    CLERK OF COURT:  Thank you.

17    THE COURT:  Good afternoon, Mr. Zahaczewsky.

18    THE WITNESS:  Afternoon, Judge.

19    THE COURT:  I know how to spell it, but for the

20  benefit of the court reporter I would ask you to say your

21  first name and last name, and spell your last name.

22    THE WITNESS:  Yes.  It's Mark Zahaczewsky, and it's

23  spelled Z-A-H-A-C-Z-E-W-S-K-Y.

24    THE COURT:  Go ahead, Mr. Dake.

25    MR. DAKE:  Thank you very much, Your Honor.

<u>DIRECT EXAMINATION</u>

BY MR. DAKE:

Q. Special Agent, can you please introduce yourself and say what your current position is?

A. Yes.  I am Special Agent Mark Zahaczewsky.  I am currently an agent -- a special agent with the FBI assigned to the Shelby resident agency in Shelby, Montana.

Q. How long have you been in that position, sir?

A. Three-and-a-half years in Shelby.

Q. And for the Court's reference, can you provide a background of your training that you received for this position?

A. (Pause)  The -- the FBI Academy, I believe, is six months long.  This is my first assignment.

Q. In that FBI training, did you also receive training about how to conduct valid searches?

A. Yes.

Q. Okay.  Can you just briefly describe that for the Court, about what that entailed?

A. It includes primarily establishing probable cause for a search and/or getting a warrant and/or consent.

Q. Thank you very much.  Special Agent, did you become involved in a search for an individual by the name of Frank Gallardo?

A. I did.

1   Q. Can you first explain to the Court how you became aware of

2   a Mr. Frank Gallardo being in the Browning, Montana, area?

3   A. Yes.  I received a telephone tip from an anonymous caller

4   who said that she -- he or she had been present or had

5   recently been at a sweat, which is a Blackfeet traditional

6   ceremony.  This was -- had occurred the previous weekend.

7   The telephone call came in on October 15th.  She said that

8   during the course of the ceremony, she identified this

9   individual, and was at one point engaged in a conversation

10  with him.  Per her statement, she said that the responses

11  that she got from this individual made her feel

12  uncomfortable.  She identified the man as a Frank Gallardo,

13  also known as Frank Thunder Hawk.

14      She noticed that the individual was there with Cheryl

15  Little Dog.  Following that, she also learned that Cheryl was

16  hosting him, so he was staying at her house for that time

17  period.  After leaving the ceremony, she did some Internet

18  research on him and discovered that there was an FBI warrant.

19  On the Open-Source FBI website there is warrants, this

20  individual's name was listed there.  He was currently wanted

21  out of the Sioux Falls, I believe it is, region for sexual

22  assault.

23  Q. Thank you, sir.  So, after you received this anonymous

24  tip, what was the follow-up that you did independently?

25  A. The first step -- we receive a lot of tips, and the first

1    step was to corroborate the tip to establish some validity.

2    It appeared to be truthful.  I looked into it and identified

3    the website that she had found his identity, and it was as

4    she had stated.

5        I then reached out to Supervisor Deputy U.S. Marshal

6    Nate Johns out of Great Falls, Montana, and I asked him for

7    some assistance, preferably the next day, to go out and

8    investigate the tip.  I also contacted the Glacier County

9    Sheriff's Office and talked to Deputy Mikey Connelly there.

10       I also reached out to Blackfeet Law Enforcement Services

11   Lieutenant J.R. Salois.  Due to Cheryl Little Dog's status as

12   a tribal council member, I knew that there might be some flak

13   with how this was approached and I wanted to ensure that I

14   had covered all of the jurisdictions by notifying the proper

15   people.  Senior Deputy Marshal Johns provided Logan Bryce and

16   said that he would be available the follow day to assist.

17   Q. What sort of internal communication did you have with

18   other agents within the FBI regarding Mr. Gallardo?

19   A. So, we work -- in the Shelby RA, we work on an on-call

20   basis.  At the time, Special Agent Jared Thompson was on

21   call.  I contacted him to let him know that this tip had come

22   in and that there might be some additional investigation

23   required.  He then contacted the Sioux Falls area and spoke

24   to a Special Agent Robert Bennett, who was the case agent

25   listed on the FBI wanted sheet.

1    Q. What sort of information did you receive back from that

2    agent in South Dakota regarding Mr. Gallardo?

3    A. He advised -- he provided the warrant and the Indictment,

4    which -- and provided some further detail about the

5    allegations of the sexual assault for which the warrant had

6    been issued.  He had said that he was recently seen, as

7    recently within the past month, fleeing the area in a

8    high-speed pursuit from tribal police in that area and that

9    he had been seen with a firearm.

10   Q. And how recent was that, sir?

11   A. I believe he said the middle of September, and this is

12   October 15th.

13           MR. DAKE:  Madam clerk, if you could please show

14   the witness what's been marked as Government's Exhibit 1,

15   please?

16   BY MR. DAKE:

17   Q. Special Agent, you mentioned going to a website and

18   finding a wanted poster for Mr. Gallardo, is this the poster

19   that you remember seeing?

20   A. Yes, it is.

21   Q. Can you describe for the Court about what sort of

22   information this provides?

23   A. General descriptive information regarding the individual,

24   a photograph, and as well as additional names, which the tip

25   had provided, as well as a caution statement regarding any --

1    how he should be approached or how he should be considered.

2    Q. Thank you, sir.  And I'll direct your attention just to

3    the very top here.  I'm going to underline the portion --

4            MR. DAKE:  Oh.  Sorry, madam clerk.  Thank you.

5    BY MR. DAKE:

6    Q. Underline the portion right there.  Do you pay attention

7    to that portion of it, as well, sir?

8    A. Yes.

9    Q. Okay.  And that is also included in the caution section,

10   as well, correct?

11   A. Correct.

12           MR. DAKE:  And, madam clerk, if we could scroll

13   down, please?  Thank you very much.

14   BY MR. DAKE:

15   Q. And the information stated down here at the bottom, what

16   is this referring to?

17   A. "Should be considered armed and dangerous," which, when

18   coupled with the statement provided by the special agent,

19   that he had recently been seen -- most recently been seen

20   with a firearm, we pay particular attention to that.

21   Q. Thank you very much, sir.  And this document was obtained

22   off of the FBI's website, correct?

23   A. Correct.

24           MR. DAKE:  And, Your Honor, regardless of the

25   applicability of the Rules of Evidence, we would move to

1  admit Government's Exhibit 1.

2          THE COURT:  Ms. Cross Guns?

3          MS. CROSS GUNS:  Uhm, you know, I -- I really have

4  no objection to it.

5          THE COURT:  All right.  Well, Mr. Dake, regardless

6  of your views on the applicability of the Rules of Evidence,

7  I'm going to admit Exhibit 1.

8  (Exhibit Number 1 was admitted.)

9          MR. DAKE:  Thank you, Your Honor.  And I would say

10  that it would be a self-authenticating document, Your

11  Honor.

12  BY MR. DAKE:

13  Q. Mr. Zahaczewsky, can you take us through, then, the search

14  that was conducted on October 16th, 2015?

15  A. Yes.  In the initial contact with the local law

16  enforcement, Deputy Connelly and Lieutenant Salois had been

17  asked to conduct a surveillance of the residence in an

18  attempt to identify any distinguishing characteristics or a

19  possibility that he might be -- of him being at the

20  residence.  We did that to identify the house, first off, and

21  then to be able to brief it the following day when the

22  remainder of the agents showed up in order to go and make

23  contact.

24          It was early in the afternoon, I forget exactly which

25  time we met at the federal building, and it included myself,

1    Deputy U.S. Marshal Bryce, two BIA Special Agents, John

2    Grinsell and Kyle Sinclair.  Blackfeet Law Enforcement

3    attended, as well; Glacier County Deputy Mikey Connelly, and

4    Blackfeet Law Enforcement drug agent, Felix Costillo.

5    Q. Special Agent, I'm going to stop you just for a moment.

6    Can you just explain to the Court just the total number of

7    officers that were involved in the search?

8            THE COURT:  Why don't we break it down by their

9    agency and who they were.

10           MR. DAKE:  Thank you, Your Honor.

11   BY MR. DAKE:

12   Q. If we can start first, how many FBI individuals were

13   involved?

14   A. One.

15   Q. How many individuals from the United States Marshals?

16           THE COURT:  Hold on.  You were the FBI agent?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  Okay.

19           THE WITNESS:  One.

20   BY MR. DAKE:

21   Q. And that was Deputy Logan Bryce?

22   A. That's correct.

23   Q. And then from Glacier County, how many?

24   A. Mikey Connelly, one.

25   Q. And then from Blackfeet Law Enforcement?

1    A. Felix Costillo.

2    Q. And then from the BIA?

3    A. John Grinsell and Kyle Sinclair.

4    Q. So a total of six individuals, correct, sir?

5    A. Yes.  At the initial briefing, Blackfeet Law Enforcement

6    also attended, J.R. Salois, because he had participated in

7    the previous surveillance, and then Misty Salois.

8    Q. How many, then, went to Ms. Little Dog's residence on

9    October 16th?

10   A. There was two per vehicle, so that would be four

11   vehicles.

12   Q. So, a total of eight officers went to her residence?

13   A. To the area, correct.

14   Q. The area.  And can you describe for the Court --

15           THE COURT:  Wait a minute, Mr. Dake.  We had six

16   officers identified as going to the meeting, who are the

17   eight that made the trip?

18   BY MR. DAKE:

19   Q. The two additional officers, sir, were Salois and -- I'm

20   sorry, the other officer?

21   A. Also a Salois.  J.R. and Misty Salois.

22   Q. So, both --

23   A. Same last name.

24   Q. And both of those were involved in the initial

25   surveillance of the home?

1    A. J.R. Salois and Mikey Connelly conducted the initial

2    surveillance the previous day.

3    Q. Thank you very much.  And, so, after you had the initial

4    briefing, how many went to Ms. Little Dog's residence?

5    A. Both Saloises, I believe, were in the same vehicle.  Mikey

6    Connelly and Felix Costillo were in an unmarked vehicle.

7    Uhm, the BIA agents were together and also in an unmarked

8    vehicle.  Deputy Bryce and I initially went to the workplace

9    of Cheryl Little Dog, the other three vehicles went out to

10   East Glacier.

11   Q. Can you describe for the Court just in general about where

12   Ms. Little Dog's house is located?

13   A. Sure.  It's in a suburban neighborhood in the East Glacier

14   area.

15   Q. Are there other houses surrounding it, or is it all by

16   itself?

17   A. There are other houses surrounding it.

18   Q. Is it on a cul-de-sac street or just a single through

19   street?  What is it on?

20   A. It's in the middle of a through street.

21   Q. And how many houses, approximately, surround that?

22   A. I couldn't -- I couldn't estimate.

23   Q. One on each side, though, sir?

24   A. Easily, yes.

25   Q. And then across the street are there houses?

1  A. There are houses across the street, and there are houses

2  on the back side of the residence.

3  Q. Thank you, sir.  Now, Special Agent, you then pull up to

4  the house, what officers pull up in front of Ms. Little Dog's

5  residence?

6  A. Prior to going out there, we had given explicit

7  instructions to Blackfeet Law Enforcement to avoid the area.

8  That they would be ready, if necessary, but we didn't want

9  them to make contact due to previous interactions with Ms.

10  Little Dog and because of her status as a tribal council

11  member.  They were in the area behind the residence.

12       Immediately behind the residence, BIA took up position

13  to observe the rear of the building.  The front of the

14  residence was observed by Mikey Connelly and Felix Costillo

15  in an unmarked vehicle, and it was approximately one or two

16  houses down across the street.

17  Q. And how many individuals were in your car, sir?

18  A. I was riding with Deputy Bryce.

19  Q. So, you and Deputy Bryce pulled up to the front portion of

20  the house, correct?

21  A. We pulled up to Deputy Connelly several houses down.

22  Q. Okay.  And, so, how --

23       THE COURT:  Mr. Dake, let me interrupt your

24  narrative.  There was discussion earlier that didn't go

25  anywhere that Marshal Bryce went to Ms. Little Dog's place of

1    work?

2              MR. DAKE:  That -- I'm sorry, Your Honor?

3              THE COURT:  I thought Mr. Zahaczewsky testified --

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  -- that at some point on the way to Ms.

6    Little Dog's house that Mr. Bryce went to Ms. Little Dog's

7    place of work.

8    BY MR. DAKE:

9    Q. Can you explain that, Special Agent, please?

10   A. Yes.  The initial plan was to send the initial vehicles

11   out to conduct surveillance on the house, to watch the house

12   while Deputy Bryce and I went to her place of work.  We hoped

13   to encounter her there and make contact at that point.  We

14   sat at her workplace, and identified no vehicle belonging to

15   Ms. Little Dog as being at her workplace.

16        We called Deputy Connelly, who, at that point, had

17   established a position in the front of the house and

18   identified several vehicles being at the residence at that

19   time.  Being that her vehicle was not at work and most likely

20   at the residence, we left the workplace and headed to East

21   Glacier.

22   Q. Thank you, sir.  And, so, Special Agent, you came to the

23   house, you pulled up to the house, where did you park your

24   vehicle?

25   A. Well, we initially pulled up in a driveway several houses

1    down where I spoke with Mikey Connelly to see what he had

2    seen in the time it took for us to get there.  He said no one

3    had come or gone in that time.  As we were speaking, the

4    front door opened and someone came out.  Deputy Bryce and I

5    determined at that time that we would go to the residence.

6          We backed out and moved, I believe it was two houses

7    down, and pulled into the driveway of the residence.

8    Q. So, you pulled into the driveway of Ms. Little Dog's

9    residence, correct?

10   A. That's correct.

11   Q. Did any other police vehicles pull in front of her

12   residence at that time?

13   A. Deputy Connelly pulled up behind us, and I believe he

14   parked on the street.

15   Q. And was he in a marked or an unmarked car?

16   A. Unmarked vehicle.

17   Q. Were there any other officers or vehicles present at that

18   time, sir?

19   A. No, sir.

20   Q. Can you take the Court through, then, what happened once

21   you exited your vehicle?

22   A. I got out of the vehicle, and the first thing that I

23   noticed was a small boy walking out the front door towards

24   us.  I encountered him, said, "Hello, how are you?  Do you

25   live here?"  He said, "This is my grandmother's house."  I

1    asked, "Who is your grandmother?"  He said, "Cheryl."  I

2    said, "Is Cheryl there?"  He said, "Yes, Cheryl is home."  I

3    said, "Is anybody else with her?"  He said, "Yes, her

4    boyfriend."

5    Q. What happened after that, then, sir?

6    A. When he said that, I heard the front door lock.  Uhm, and

7    I directed my attention to the front door, and I pointed to

8    it to alert the other officers behind me that motion was at

9    the door.  At that time, Deputy Bryce was behind me and had

10   shown the boy a photograph, and he identified him as Frank

11   Gallardo.

12   Q. How many officers were outside of the house on foot at

13   this point?

14   A. At that point, I believe just three.

15   Q. And, so, what did you do after this, then, sir?

16   A. I went to the front of the residence and I knocked

17   announcing myself and -- my identification and the authority

18   reps who were there.  I knocked approximately three times

19   asking Cheryl to come to the door.  I got no response.

20   Q. How long did you wait in between each of those knocks,

21   sir, approximately?

22   A. I couldn't estimate.  It was a lengthy period of time.  We

23   were all -- we all knew Cheryl's situation, being that she

24   was in a wheelchair and it might take a little bit longer to

25   get to the door.  So, we knocked and gave her appropriate

1  time.

2  Q. So, you knocked a total of three times announcing each

3  time who you were?

4  A. That is correct.

5  Q. Okay.  And what happened after that?

6  A. I believe it was three times.  And after the third time

7  that I knocked, Deputy Bryce knocked.  He announced the same

8  thing, and at that point he said, Cheryl, come to the door, I

9  don't want to kick it in or I'm going to kick it in.

10 Q. Something about kicking the door in?

11 A. Something about kicking it in, correct.

12 Q. And, so, what happened after that?

13 A. I heard, "Hold on."

14 Q. From inside of the house?

15 A. From inside of the house.  I heard, "Hold on," and, again,

16 we provided adequate time for her to open the door.  The door

17 opened at that time.  Deputy Bryce initially made contact

18 with her.  And she said, "Hold on," and she backed away from

19 the door to allow the door (sic) to enter.  Inside the front

20 of the residence is a threshold --

21 Q. Special Agent, if I could just stop you for a moment.  If

22 you could just describe for the Court, is this a single door

23 or are there two doors?  What do the doors look like?

24 A. It's a single door.

25 Q. Is there a screen door, as well, sir?

1    A. There is a screen door.

2    Q. So, you had -- had you opened the screen door in order to

3    knock?

4    A. I had opened the screen door, and it was behind me.  I was

5    holding it open as I knocked.

6    Q. And, then, when Ms. Little Dog opened the door for you,

7    you said she opened the door partway?

8    A. Correct.

9    Q. And then what happened after that, sir?

10   A. That was to allow her -- she asked for time to back away

11   from the door so that the door could open completely.  At

12   that time, Deputy Bryce introduced himself, he said, "Hi,

13   Cheryl."  Deputy Bryce had dealt with Cheryl in the past and,

14   apparently, they know each other.  So, he made contact with

15   her, and he said, "We are looking for Frank."  I believe she

16   said, He is not here.  She --

17             MS. CROSS GUNS:  Your Honor, --

18             THE COURT:  Hold on.

19             MS. CROSS GUNS:  Just if I may object to him

20   testifying as to what Mr. Bryce said.  Mr. Bryce is going to

21   testify.

22             THE COURT:  Yeah.  Okay.  Well, let's get to that.

23   I mean, he can testify as to what he heard, but let's move on

24   here quickly with what Mr. Zahaczewsky was doing.  Mr. Bryce

25   can speak for himself.

```
 1              MR. DAKE:  Thank you, Your Honor.
 2   BY MR. DAKE:
 3   Q. And, so, Special Agent, can you just describe what
 4   happened when you entered the residence, then?  How did that
 5   occur?
 6   A. Yes.  I heard Deputy Bryce speaking with Cheryl; and as
 7   they made their way into the residence, I followed.
 8   Q. And where were they going in the residence?  Where did you
 9   observe them going?
10   A. Into the living room.
11   Q. How far away, approximately, sir, was the front door area
12   to the living room?
13   A. It would be me to the front of that desk (indicating).
14   Q. So, approximately, seven feet?
15   A. Approximately.
16   Q. From the front door area where you were standing to where
17   they moved to, correct?
18   A. Correct.  And, then, from that point, it opens up into the
19   main living room.
20   Q. At any point during this time did Ms. Little Dog tell you
21   that you could not enter the residence?
22   A. No, she did not.
23   Q. Tell us what happened, then, after you had entered the
24   residence and what you were doing.
25   A. I moved to a position that I could observe the hallway.
```

1    Uhm, Cheryl was being cooperative, and I waited for consent,

2    and Deputy Connelly to move with me, to conduct a search of

3    the residence.

4    Q. What happened after that, then, sir?

5    A. Deputy Bryce remained in the living room with Cheryl.

6    Deputy Connelly and I searched the residence.  Shortly after,

7    we were joined by Felix Costillo.

8    Q. So, how many officers total were in the residence at this

9    time?

10   A. Four.

11   Q. So, take us through what happens with the search at this

12   time, sir.

13   A. As I had moved from room to room, I announced -- or I

14   called out to Frank by name, announcing that we were law

15   enforcement and asked him to comply and come out.  There was

16   no response.  And then we searched the residence for any

17   place that people could be hiding.

18   Q. Can you take the Court through the different rooms that

19   you searched?

20   A. Yes.  On entry, there was a hallway to the left.  Down the

21   hallway, there is a bathroom on the right, the first door.

22   There is a space where the washing machine and dryer are, and

23   then a main master bedroom on the right-hand side.  On the

24   left-hand side, there is an immediate bedroom, and another

25   bedroom at the end of the hallway on the left.

1    Q. Is this a single-story residence, sir?

2    A. With a crawlspace and an attic.

3    Q. Thank you, sir.  So, after you checked all of these rooms,

4    did you find Mr. Gallardo?

5    A. We did not.

6    Q. What did you do next?

7    A. I joined Deputy Bryce as he was talking to Cheryl.  She

8    was cooperating and providing information about her previous

9    contacts with Frank Gallardo.

10   Q. And what did you do after that, then, sir?

11   A. The search of the house was complete and we left the

12   residence.

13   Q. Prior to leaving the residence, did you also search the

14   attic, sir?

15   A. We did.

16   Q. And can you describe that for the Court, please?

17   A. It was determined that it was an area that a person could

18   be hiding.  With the assistance of Mikey Connelly and Felix

19   Costillo, I gained access to it and crawled around upstairs

20   looking.  Finding no person, I left.

21   Q. Prior to leaving --

22            THE COURT:  Hold on, Mr. Dake.

23            MR. DAKE:  Oh, thank you.

24            THE COURT:  Mr. Zahaczewsky, how did you enter the

25   attic?

 1              THE WITNESS:  I stood on Mikey Connelly's --

 2              THE COURT:  Was there a hole in the ceiling?

 3              THE WITNESS:  A hole in the ceiling?  Yes, Your

 4   Honor.

 5   BY MR. DAKE:

 6   Q. And that entryway to the attic, where was that located,

 7   sir?

 8   A. Towards the end of the hallway.

 9   Q. Thank you very much.  Prior to leaving the residence, you

10   had been there for approximately how long, inside of the

11   house?

12   A. Ten minutes.

13   Q. Can you describe Ms. Little Dog's overall demeanor?  Was

14   she nervous?  Can you provide that for the Court, please?

15   A. She was cooperative, and appeared surprised at the

16   knowledge of the warrant.

17   Q. At the knowledge of the arrest warrant, correct?

18   A. Correct.

19   Q. Okay.  Thank you very much.  Can you explain to the Court

20   what you did, then, after you left the residence?

21   A. We left the residence and drove approximately a block and

22   a half, two blocks to a gas station, where we reconvened and

23   discussed what we had found.  We were there for approximately

24   five minutes, during which time I called -- I attempted to

25   contact Special Agent Bennett to let him know that we had

1  information provided by Cheryl that he had been -- that Frank

2  Gallardo had been in this area recently and had a new phone

3  number.  I wanted to pass that information on to him.

4       It was also discussed that due to Deputy Bryce's

5  previous interactions with Cheryl, she was very cooperative

6  and he found that odd.  That, coupled with the child's

7  statement that her boyfriend was there now and the

8  introduction of the idea that we might have missed a

9  crawlspace, made us want to return to the residence.

10 Q. How did this idea of a crawlspace come about?

11 A. Kyle Sinclair came up and said, "I'm familiar with this

12 area, did you guys check the crawlspace?"

13 Q. And what was your response?

14 A. "No, I must have missed it."

15 Q. What did you decide to do, then, at that point, sir?

16 A. Return to the residence.

17 Q. And who returned to the residence?

18 A. Deputy Bryce and I returned to the residence.

19 Q. Were you joined by any other officers?

20 A. Not at the residence.  They drove to the area but did not

21 come into the house.

22 Q. So, this is your second approach, then, to the house,

23 correct?

24 A. That is correct.

25 Q. And where did you park this time?

1    A. In the same place, pulled into the driveway.

2    Q. Can you describe what happened when you got out --

3              THE COURT:  Hold on, Mr. Dake.

4              MR. DAKE:  Thank you, Your Honor.

5              THE COURT:  Mr. Zahaczewsky, how much time elapsed

6    between when you left Ms. Little Dog's house and drove to the

7    gas station?

8              THE WITNESS:  Approximately, five minutes.

9              THE COURT:  How long were you at the gas station?

10             THE WITNESS:  Approximately, five minutes.

11             THE COURT:  So, you then returned back to Ms.

12   Little Dog's house, how much time between when you left Ms.

13   Little Dog's house and when you returned to her house?

14             THE WITNESS:  Approximately, five minutes, Your

15   Honor.

16             THE COURT:  Five, total?

17             THE WITNESS:  Five to ten.

18             THE COURT:  Were you set up in a spot -- you left

19   the house, went to the gas station, how long did it take you

20   to get to the gas station?

21             THE WITNESS:  Oh, it's, like, a block and a half,

22   Your Honor.

23             THE COURT:  Okay.  So, a minute or two.

24             THE WITNESS:  Correct.

25             THE COURT:  You talked at the gas station for how

1  long?

2           THE WITNESS:  Approximately, five minutes.

3           THE COURT:  The drive is a few minutes -- one or

4  two minutes back.

5           THE WITNESS:  Correct.

6           THE COURT:  So, it was seven, eight minutes.

7           THE WITNESS:  Correct, Your Honor.

8           THE COURT:  That would be a reasonable estimate.

9           THE WITNESS:  Yes, Your Honor.

10          THE COURT:  Okay.  Go ahead, Mr. Dake.  I'm

11  sorry.

12          MR. DAKE:  Thank you, Your Honor.

13  BY MR. DAKE:

14  Q. So, take us through, then, what happened when you exited

15  the vehicle, then, sir.

16  A. Deputy Bryce walked up to the door and knocked, calling

17  Cheryl by name.  Cheryl responded and opened the door.

18  Q. Did Ms. Little Dog respond on the first knock this time?

19  A. (Pause)  I believe she did.

20  Q. Thank you, sir.  And, so, what happened after that?

21  A. Deputy Bryce -- I overheard Deputy Bryce speaking to

22  Cheryl about possibly missing something and he wanted to talk

23  with her further.

24  Q. Were you standing at the doorway with Deputy Bryce?

25  A. I was.

1  Q. And, again, did you have the screen door open?

2  A. We did.

3  Q. And was the front door fully open?

4  A. When she responded, it was very similar to the first time.

5  She said, "Hold on," and backed away so that the door could

6  open completely.

7  Q. Okay.  And, then, what did Ms. Little Dog do after she had

8  opened the door fully?  Where did she go at that point?

9  A. Into the living room.

10  Q. Did she tell you at any point at that time that you could

11  not come inside the residence?

12  A. She did not.

13  Q. Okay.  So, what did you and Deputy Bryce do?

14  A. Deputy Bryce had mentioned -- I overheard Deputy Bryce

15  mention that there might be a crawlspace and that we were

16  interested in looking at it.

17  Q. What happened after that, then, sir?

18  A. At that time, I received a call back from Special Agent

19  Bennett, and I waited until I overheard Deputy Bryce receive

20  consent from Cheryl to go back to the bedroom where the

21  crawlspace might be located.

22  Q. And before we get to that, can you describe Ms. Little

23  Dog's demeanor at this time?

24  A. She was cooperative.

25  Q. Did she seem upset or angry that you-all were back and

1   wanting to be in her house again?

2   A. She denied there was a crawlspace but said go ahead and

3   look.

4   Q. And you were on the phone with Special Agent Bennett; is

5   that correct, sir?

6   A. That is correct.

7   Q. And just for clarification, he is the agent out of South

8   Dakota, right?

9   A. That is correct.

10   Q. Thank you very much, sir.  So, what happened then?  What

11   did Ms. Little Dog do at this point?

12   A. I believe I walked back to the bedroom in the lead, with

13   Logan and Ms. Little Dog directly behind me.

14   Q. "Logan," that's Deputy Bryce, correct, sir?

15   A. Correct.  Deputy Bryce, correct.

16   Q. Thank you.  And Ms. Little Dog was also accompanying

17   you?

18   A. Yes.

19   Q. Okay.  And, so, where did you go, sir?

20   A. I walked into the bedroom.  I stood at the far end of the

21   room while I continued the conversation with Special Agent

22   Bennett.

23   Q. Why did you walk into this specific bedroom?

24   A. That particular bedroom had a great deal of clothing items

25   and clutter piled in the middle of the room.  That was -- I

1    believed that's -- I did not hear where she said it was, but

2    that was where I believed it was most likely that the access

3    to the crawlspace would be.

4    Q. And what happened at that point, then, sir?

5    A. Deputy Bryce moved the items from the floor inside the

6    closet.  The closet door was opened, many of these items had

7    spilled into the closet.

8             THE COURT:  Hold on, Mr. Zahaczewsky.  You stated

9    that you believed this bedroom was where the -- most likely

10   the access to the crawlspace would be?

11            THE WITNESS:  Yes, Your Honor.

12            THE COURT:  Why?

13            THE WITNESS:  Because the floor was covered with

14   items.  And it would -- with the closet opened, it would have

15   obscured the access point to the crawlspace.

16            THE COURT:  Go ahead.

17   BY MR. DAKE:

18   Q. For clarification, Special Agent, did you see a crawlspace

19   opening in any other room when you were searching earlier?

20   A. I did not.

21   Q. And were you able to view the floor in each of those

22   rooms?

23   A. (Pause)  I wouldn't say completely that I could view the

24   floor in every one of those rooms.

25   Q. You mentioned going into this room, and Ms. Little Dog

1    accompanied you; is that correct?

2    A. Correct.

3    Q. Did she at any point say the crawlspace is not in this

4    room?

5    A. She did not.

6    Q. Thank you very much, sir.  So, what happened after that?

7    A. Deputy Bryce identified an access point for a crawlspace,

8    and he alerted me to that.  I ended the phone call as Deputy

9    Bryce removed the opening to the crawlspace.

10   Q. And, Special Agent, I'll stop you for a moment.  Can you

11   describe for the Court just the overall size of this room and

12   where you were located?

13   A. It's a relatively-small bedroom with an open closet.  The

14   access point is two, two-and-a-half feet by two-and-a-half

15   feet, at most.  There were clothing items wedged in between

16   the crawlspace door and the floor.  Uhm, it was primarily --

17   it appeared that there were -- there was packing going on,

18   there was clutter all over the middle of the room.

19   Q. Where were you standing, sir?

20   A. When I walked in, I walked towards the window, which would

21   have been the far side of the room, to allow Deputy Bryce and

22   Ms. Little Dog to enter.

23   Q. And where was Ms. Little Dog at this time?

24   A. She was behind me in the threshold of the door.

25   Q. So, in the doorway area.

1    A. In the doorway area, that's correct.

2    Q. And, so, you saw this access point to what looked like a

3    crawlspace, and did Ms. Little Dog provide any indication to

4    not look there or to not open that crawlspace area?

5    A. She did not.

6    Q. Okay.  So, what happened after that?

7    A. Deputy Bryce removed the cover to the crawlspace and

8    pointed down directing my attention to something that he had

9    seen at the bottom.  As I looked, a brassiere was at the

10   bottom of it, and it was evident of additional clothing items

11   wedged into the door, with the crawlspace hatch door.

12   Q. What happened after that, then, sir?

13   A. We announced, we called down, "Frank, law enforcement,

14   come out.  Don't make us come down there."  Uhm, provided an

15   opportunity for a response, there was none.  Deputy Bryce

16   said, "I will go," and jumped down into the hole.

17   Q. At this time, did Ms. Little Dog say anything to law

18   enforcement?  Did she say anything to you?

19   A. She said nothing.

20   Q. Okay.  So, she -- did she ever say, "Stop searching," or

21   "I'm not consenting to this"?

22   A. No, I heard nothing.

23   Q. Thank you, sir.  So, what happened after that, then, once

24   Deputy Bryce was in the crawlspace area?

25   A. Deputy Bryce was in the crawlspace and with a flashlight

1    cleared the immediate area.  I hovered over the hole as he

2    did so.  He called out several times to Frank.  At one point,

3    he identified a dead space area in the back of the foundation

4    and said that he was going to go look at this.

5    Q. And were you down in the crawlspace area at this point, or

6    were you still up above, sir?

7    A. I was still above.

8    Q. And, then, when did you enter into the crawlspace?

9    A. As Deputy Bryce moved towards the dead space area, I heard

10   him yell, "Show me your hands!  Show me your hands!  Show me

11   your hands!"  At that point, I jumped into the hole and moved

12   to his position.

13   Q. And what did you observe when you went down into the

14   crawlspace?

15   A. Behind the corner of the foundation there was insulation

16   and blanket material, and just above that I saw a man's

17   head.

18              THE COURT:  Mr. Zahaczewsky -- let me interrupt you

19   again, Mr. Dake.

20              MR. DAKE:  Thank you, Your Honor.

21              THE COURT:  You talked about a dead space area,

22   what -- how is that different from the rest of the

23   crawlspace?

24              THE WITNESS:  Your Honor, underneath the house you

25   could see the entire open area.  At one point, approximately

 1   30 feet from the crawlspace, was a right-hand turn.

 2             THE COURT:  From the crawlspace opening?

 3             THE WITNESS:  Underneath the crawlspace --

 4             THE COURT:  You said, "30 feet from the

 5   crawlspace," you mean the crawlspace opening.

 6             THE WITNESS:  Right.  Correct.  Correct, Your

 7   Honor.  30 feet away from that point there is a turn in the

 8   foundation that provided an area that could not be observed

 9   (indicating) from directly underneath the crawlspace.

10             THE COURT:  And it's the area beyond the corner

11   that you are calling a dead space.

12             THE WITNESS:  Correct.

13             THE COURT:  Okay.  Go ahead, Mr. Dake.

14             MR. DAKE:  Thank you, Your Honor.

15   BY MR. DAKE:

16   Q. What did you say to the individual in the crawlspace at

17   the time, sir?

18   A. Deputy Bryce, at that point, had yelled at him a

19   half-dozen times, "Show me your hands!  Show me your hands!

20   Show me your hands!"  It was a very consistent command given.

21   The individual said, "Fuck you.  Shoot me.  Fuck you.  Shoot

22   me."

23   Q. And what happened after this, then, sir?

24   A. As I moved to position, both of us had our firearms

25   pointed at this man.  Deputy Bryce said, "I'm going to tase

1    you!  I'm going to tase you, show me your hands!"  Again,

2    "Just do it, then.  Fuck you.  Shoot me."  Deputy Bryce

3    deployed his taser, gave him a final warning, "I'm just going

4    to tase you!  Show me your hands!"  Again, same response.  He

5    fired the taser, the taser misfired.  At that point, I gave

6    the following command, "Show me your hands!  Show me your

7    hands!"

8        At that point, he said words to the effect that I'm not

9    going to let you cops, you tribal cops beat me again.  It

10   became evident to me that he may not quite understand who we

11   were.  I identified myself again as a federal agent and that

12   we had a warrant for him and he would not be beaten.  At that

13   point, he complied, showed his hands slowly and was taken

14   into custody.

15   Q. Thank you, sir.  You mentioned when you were in the

16   crawlspace area that you had your firearm drawn, did you have

17   your firearm drawn when you first entered Ms. Little Dog's

18   residence?

19   A. The -- on the first --

20   Q. On the second search, sir.

21   A. On the second search, no, sir.

22   Q. And it was just you and Deputy Bryce, correct?

23   A. That is correct.

24   Q. And you had no firearms drawn at this point?

25   A. That is correct.

1    Q. Going back, then, just to the first search for firearms

2    purposes, did you have your firearms drawn at the time of the

3    first search?

4    A. Yes.

5    Q. And why is that?

6    A. Because he was an armed individual and I had been given

7    reason to believe that he was there now.

8    Q. Who else had firearms drawn?

9    A. I believe we all did.

10   Q. Thank you, sir.  And when you, then, came back to the

11   residence, did you still have your firearm on you at that

12   time?

13   A. Yes.

14   Q. And did Deputy Bryce have his firearm on him?

15   A. Yes.

16   Q. But neither of them were pulled out.

17   A. That's correct.

18   Q. Until you were within the crawlspace?

19   A. That's correct.

20   Q. As you were leaving the residence with Mr. Gallardo, what

21   did you do with Ms. Little Dog, then, at that point?

22   A. As I was leaving the residence?

23   Q. Yes, sir.

24   A. (Pause)  I did nothing with Ms. Little Dog.

25   Q. And what --

1    A. She was detained by Blackfeet Law Enforcement at that

2    time.

3    Q. And we will go to that here in a moment, sir.  And I

4    apologize, that was a tough question.  When you came up from

5    the crawlspace there with Mr. Gallardo, what did you direct

6    law enforcement to do at that point?

7    A. To detain her.

8    Q. And was this a -- to arrest her, or just to detain her?

9    A. I don't recall the exact words.

10   Q. Okay.  And why were you doing that at that point, sir?

11   A. So that we could con -- secure the area and determine if

12   there was any other reason or anything else to be done.  But,

13   at that point, her roaming free might have been an issue.

14   Q. And, so, you took Mr. Gallardo outside of the residence.

15   A. Correct.

16   Q. What happened after that?

17   A. Mr. Gallardo was taken into custody and placed into the

18   back of Deputy Marshal -- Deputy Bryce's vehicle.  Uhm, Ms.

19   Little Dog was just detained out front.  I made several phone

20   calls confirming who we had to Special Agent Bennett, as well

21   as United States AUSA Danna Jackson.  I called her, as well,

22   to let her know what we had, and that was what we did.

23   Q. And, then, what was the decision that you made federally

24   as far as whether you were going to arrest Ms. Little Dog at

25   that point?

1   A. We were not going to arrest her at that time.

2   Q. And what did you decide to do at that point, sir?

3   A. She was released and allowed to go back into her house.

4   Q. What happened after that, then, sir?  What did you do?

5   A. At that time, due to Ms. Little Dog being cooperative for

6   the duration of those events, I thought it an opportune time

7   to interview her.

8   Q. You mentioned that Ms. Little Dog was cooperative, in

9   either the first or the second search was Ms. Little Dog --

10  did she ever tell you to not come inside of her residence or

11  that you could not search?

12  A. She did not.

13  Q. Was her overall demeanor nervous, excited?  Can you

14  describe that for the Court in general between both searches?

15  A. I thought she was very cooperative and willing to share

16  information about what she -- well, willing to share

17  information, period.

18  Q. Did she seem scared at any point, sir?

19  A. No.

20  Q. Thank you.  You began an interview with Ms. Little Dog,

21  correct?

22  A. Correct.

23  Q. And can you just describe for the Court, in a general

24  context, about that interview, please?

25  A. Sure.  Because Ms. Little Dog had gone back into the

residence, uhm, I requested that Special Agent Grinsell

assist me in the interview.  I took off my identification

marks and grabbed a recorder.  We knocked on the door; Cheryl

responded.  I asked her if we could talk to her for a few

minutes, she agreed and invited us into the living room.  I

let her know that I would like to interview her at this time

and that I was going to be recording the interview.

Q. And what did Ms. Little Dog say?

A. She was willing to conduct the interview.

Q. And what did she tell you during this interview about her

previous interactions with law enforcement?

A. She noted that she had had issues with Blackfeet Law

Enforcement and Glacier County in the past.

Q. Did she say anything about understanding the law?

A. She did.

Q. What did she tell you about that, sir?

A. That she knows the law, she understands the law.  At that

time, she was Mirandized just for the purposes of

acknowledging the fact that she was aware that she could ask

us to leave at any time.  She signed the consent form.  At

one point, she stated that she knows how we operate and what

we do, and that she had worked with the FBI in the past.

        THE COURT:  Mr. Zahaczewsky, who provided Miranda

warnings to Ms. Little Dog?

        THE WITNESS:  I did, Your Honor.

```
 1              THE COURT:  Okay.  Go ahead, Mr. Dake.
 2              MR. DAKE:  Thank you, Your Honor.
 3    BY MR. DAKE:
 4    Q. You provided these Miranda warnings, what else did you
 5    tell Ms. Little Dog at this point, though, from your
 6    perspective?
 7    A. That she was not going to be arrested, we had no plans to
 8    take her away from -- at that time.
 9    Q. And that was based on your discussions with other
10    individuals who were not present during that search?
11    A. That is correct.
12    Q. Thank you, sir.  Did Ms. Little Dog tell you anything else
13    about her interactions or about her time with Mr. Gallardo?
14    A. She said that he had arrived the previous Friday and he
15    had left on Wednesday, uhm, and she had not seen him since.
16    Q. How did the interview end?
17    A. I'm sorry?
18    Q. How did the interview end?
19    A. She asked us to leave.
20    Q. Why?
21    A. Uhm, we were asking her about clarifying some facts.  She
22    was not comfortable with the fact that we did not quite
23    believe what she was saying, and she said, "Well, I'm done
24    with this, please leave."
25    Q. And what did you do?
```

1    A. We left.

2    Q. Did you turn off the recorder at that time?

3    A. I did.

4    Q. Was this the first time that Ms. Little Dog told you to

5    leave her house?

6    A. Yes, it was.

7    Q. Thank you very much, sir.

8              MR. DAKE:  Your Honor, we've submitted what's been

9    marked as Government's Exhibit 3 to the clerk.  It is a

10   recording of the entirety of that interview.  We are not

11   planning to play it, unless the Court would like us to, but

12   have provided it to the Court for reference in this

13   hearing.

14             THE COURT:  How long is it?

15             MR. DAKE:  It is about 20 minutes -- 28 minutes,

16   Your Honor.

17             THE COURT:  Ms. Cross Guns, do you have any

18   preference on it?  I think it might be important.

19             MS. CROSS GUNS:  You know, I think the fact that

20   the agent has indicated that she was cooperative and had no

21   issues until they expressed apparent disbelief, I don't know

22   that it's going to add --

23             THE COURT:  All right.  Well, I will -- any

24   objection to its admission, Ms. Cross Guns?

25             MS. CROSS GUNS:  No.

1              THE COURT:  All right.  Exhibit 3 will be admitted.

2    I won't require us to play it now.  I may listen to it after

3    the hearing.

4    (Exhibit Number 3 was admitted.)

5              THE COURT:  So, both parties are aware that it's

6    part of the record and I'm free to go through it at my

7    leisure.

8              MR. DAKE:  Thank you, Your Honor.

9              THE COURT:  Go ahead, Mr. Dake.

10             MR. DAKE:  Thank you, Your Honor.  A moment,

11   please, Your Honor?

12             THE COURT:  A moment.

13             MR. DAKE:  Thank you.

14   (Discussion off the record.)

15   BY MR. DAKE:

16   Q. Sir, just some clarifications as far as dates and days of

17   the week.  When you received this tip from the informant,

18   what day was that, sir?

19   A. Thursday.

20   Q. And that was October 15th?

21   A. October 15th, that's correct.

22   Q. And what day was the search conducted?

23   A. October 16th, Friday.

24   Q. Thank you, sir.  And in your conversations with Ms. Little

25   Dog, when did she say that it was the last time that she had

1   seen Mr. Gallardo?

2   A. She had said that she had seen him prior to going to work

3   Wednesday morning.

4   Q. And the search, then, was conducted on Friday, correct?

5   A. Correct.

6   Q. And the tip that you received was that they had seen Ms.

7   Little Dog with Mr. Gallardo how far back?

8   A. The previous weekend.

9   Q. So, based on that information, you had the tip saying that

10  they were together the previous weekend and Ms. Little Dog

11  stating that they were together earlier in the week,

12  correct?

13  A. Correct.

14  Q. Special Agent, what would have happened had she not

15  consented to the search of her residence?  What would you

16  have done?

17  A. We would have had a discussion regarding possible exigency

18  and/or applied for a warrant.

19  Q. If you had obtained a warrant for Ms. Little Dog's

20  residence, would that have included a search of the

21  crawlspace area?

22  A. It would have.

23  Q. And was that where Mr. Gallardo was eventually found?

24  A. Yes, it was.

25          MR. DAKE:  Thank you, sir.

```
 1           A moment please, Your Honor?

 2                THE COURT:  Another.

 3                MR. DAKE:  Thank you.

 4   (Discussion off the record.)

 5                MR. DAKE:  No further questions, Your Honor.

 6                THE COURT:  Thank you, Mr. Dake.

 7           Ms. Cross Guns, cross-examination, please.

 8                MS. CROSS GUNS:  Thank you, Your Honor.

 9                      CROSS-EXAMINATION

10   BY MS. CROSS GUNS:

11   Q. Good afternoon.

12   A. Good afternoon, ma'am.

13   Q. And I will try to speak into this, because I have kind of

14   a soft voice.

15                THE COURT:  That -- you can raise or lower that

16   podium as much as you need.

17                MS. CROSS GUNS:  I think --

18                THE COURT:  Mr. Dake had it way up.  So, if you

19   need to lower it, go ahead.

20                MS. CROSS GUNS:  I think I'll be okay.

21                THE COURT:  Go ahead.

22   BY MS. CROSS GUNS:

23   Q. And I just have a few questions for you.

24   A. Yes, ma'am.

25   Q. I want to know, when you spoke to the small child that
```

 1    came out of Cheryl's house, did you identify yourself as law

 2    enforcement?

 3    A. (Pause)  I can't remember how I identified myself, but I

 4    did have a big "FBI" on my chest (indicating).

 5    Q. Okay.  Do you know if he can read?

 6    A. I do not.

 7    Q. Okay.  Did you ascertain in your discussions with this

 8    child whether he could read or whether he understood anything

 9    you said to him?

10    A. I did not.

11    Q. Did you ascertain his grade level in school or if he was

12    in school?

13    A. I did not.

14    Q. Do you know his age?

15    A. Approximately, six.

16    Q. How -- did he tell you that?

17    A. No.  I know that now.

18    Q. Okay.  But at the time, you didn't know?

19    A. No.

20    Q. Did you do anything to corroborate what he told you?

21    A. As far as what?

22    Q. Well, you indicated in your testimony that he said,

23    Grandma is in there and her boyfriend, and it's my

24    understanding that -- based on the reports, that there was

25    another child, a 14-year-old child, that was either coming

1    out of the residence or coming to the residence that could

2    have corroborated.  But it doesn't appear --

3    A. If I had been able to make contact with the 14-year-old

4    child, I would have liked to have done that.

5    Q. Okay.  Where was she?  Because it's unclear in your

6    report.

7    A. I did not see her.

8    Q. Okay.  So, you had your -- did you have your guns drawn

9    when you spoke with the child?

10   A. No.

11   Q. Okay.  When did you actually draw your weapon?

12   A. When the door began to open.

13   Q. Okay.  And, so, the first thing that Ms. Little Dog might

14   see is a bunch of guns.

15   A. I would say that it's not common practice to stick your

16   gun into the face of someone opening a door, but I had it

17   readily available.

18   Q. Okay.  You and others.

19   A. Others.

20   Q. And where were the guns pointed?

21   A. I can't tell you where everyone's gun was pointed.

22   Q. Where was your gun pointed?

23   A. To the ground.

24   Q. Okay.  But in full view?

25   A. In full view, but secured to my person.

1   Q. What does that mean?

2   A. It means it's close-hold.  It's not out here

3   (indicating).

4   Q. Right.

5   A. (Nods head affirmatively)

6   Q. Can you show me?

7   A. Here (indicating).  If I had my gun out and I were making

8   entry into a building or a house, I would knock on the door

9   and have my gun close to my body.  So that anything that came

10  out would not interfere with my firearm being overextended.

11          MS. CROSS GUNS:  Okay.

12          THE COURT:  Hold on.  Mr. Zahaczewsky, so the

13  record is clear.  It doesn't translate well with the court

14  reporter to have you move your arm around.  So, explain where

15  your arm is when you were engaged in -- or engaged in a

16  close-hold of the weapon.

17          THE WITNESS:  It is clenched close to my body,

18  pulled towards my chest.

19          MS. CROSS GUNS:  Okay.

20          THE COURT:  How many hands on the weapon?

21          THE WITNESS:  It depends on if I was knocking on

22  the door at the time or if I was waiting for a response.

23          THE COURT:  And where would the barrel be pointed?

24          THE WITNESS:  Down and away.

25          THE COURT:  Toward the ground?

```
 1              THE WITNESS:  Correct.
 2              THE COURT:  Okay.  Go ahead, Ms. Cross Guns.
 3              MS. CROSS GUNS:  Thank you, Your Honor.
 4    BY MS. CROSS GUNS:
 5    Q. Okay.  So, you had your guns drawn.  And previous to that,
 6    Deputy Bryce had indicated he might have to kick the door
 7    down.
 8    A. He did.
 9    Q. Okay.  (Nods head affirmatively)  So, when you got in the
10    house and you did your search, the initial search, did you
11    find anything that might have belonged to Frank that appeared
12    to be a man's clothing or anything like that?
13    A. I observed this pair of cowboy boots in the first
14    bedroom.
15    Q. Okay.  Men's cowboy boots.
16    A. Men's cowboy boots, correct.
17    Q. You didn't see anything about the search that indicated
18    that Mr. Gallardo might still be there.
19    A. That was all I saw.  And that was a specific question I
20    asked earlier.
21    Q. Okay.  I want to ask you just briefly about search warrant
22    procedure.  Okay.  So, you get a search warrant to search a
23    house for a person or items and you go to the house and you
24    don't find any of those, can you go back to the house on the
25    same warrant, or do you have to get a new warrant?
```

1    A. If you leave the premises and it's unsecured, you need a

2    new warrant.

3                   MS. CROSS GUNS:  Okay.  Thank you.

4                   THE COURT:  Any more questions?

5                   MS. CROSS GUNS:  No, I'm done.  Thank you.

6                   THE COURT:  All right.  Redirect, Mr. Dake.

7                   MR. DAKE:  Thank you, Your Honor.

8                        REDIRECT EXAMINATION

9    BY MR. DAKE:

10   Q. Special Agent, who showed the child the picture when you

11   were out front?

12   A. Deputy Bryce.

13   Q. Were you standing next to him at that point?

14   A. I was.

15   Q. Why did you -- what diverted your attention from the

16   child?

17   A. The locking of the door.

18   Q. And what did you do at that point, then, sir?

19   A. Directed my attention to the door.

20   Q. Did you focus on any other children that could have

21   possibly been in the front area?

22   A. I did not.

23   Q. Thank you, sir.  Ms. Cross Guns asked you about where your

24   gun was located when Ms. Little Dog opened the door.  Do you

25   remember that, sir?

1    A. She did.

2    Q. And at that point, you had already knocked a total of four

3    times, correct?

4    A. Correct.

5    Q. And you-all had identified yourselves as law

6    enforcement?

7    A. Correct.

8              MR. DAKE:  Thank you, sir.

9         I have no further questions, Your Honor.

10             THE COURT:  Is the witness excused?

11             MR. DAKE:  He is.  Thank you, Your Honor.

12             THE COURT:  You may step down, Mr. Zahaczewsky.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Mr. Dake, call your next witness,

15   please.

16             MR. DAKE:  Thank you, Your Honor.  We call Deputy

17   Marshal Logan Bryce, please.

18             MS. CROSS GUNS:  Your Honor, before we get into

19   this testimony, can we take a short break?

20             THE COURT:  Sure.  Let's take a five-minute break.

21             MS. CROSS GUNS:  Thank you.

22             THE COURT:  Mr. Bryce can get himself together.

23   (Recess taken.)

24             THE BAILIFF:  The United States District Court is

25   back in session.

 1          THE COURT:  Please be seated.  Mr. Dake.

 2          MR. DAKE:  Thank you, Your Honor.  The United

 3    States calls Deputy United States Marshal Logan Bryce.

 4          CLERK OF COURT:  Please raise your right hand.

 5    (The witness was duly sworn.)

 6          THE WITNESS:  I do.

 7          THE COURT:  Good afternoon, Mr. Bryce.

 8          THE WITNESS:  Good afternoon, Your Honor.

 9          THE COURT:  Please state your full name and spell

10    your last name.

11          THE WITNESS:  William Logan Bryce, B-R-Y-C-E.

12          THE COURT:  Go ahead, Mr. Dake.

13          MR. DAKE:  Thank you, Your Honor.  Your Honor, for

14    record purposes, before Deputy Bryce testifies, will the

15    record reflect that he was outside of the courtroom during

16    the testimony of Special Agent Zahaczewsky?

17          THE COURT:  The record will reflect.

18          MR. DAKE:  Thank you, Your Honor.

19                     DIRECT EXAMINATION

20    BY MR. DAKE:

21    Q. Good afternoon, sir.

22    A. Good afternoon.

23    Q. Can you please state your current position?

24    A. I am a Deputy United States Marshal.

25    Q. How long have you been in that position, sir?

1    A. Over 19 years.

2    Q. And just as a basic breakdown for the Court, what sort of

3    training have you received in this position?

4    A. I attended the U.S. Marshals Service Academy down at

5    FLETC, and I also attended the criminal investigator school

6    down at FLETC.  I've attended multiple other trainings

7    throughout my career, both state and local.

8    Q. Have you received training regarding searching for

9    individuals?

10   A. Yes.  I've done multiple trainings in regards to fugitive

11   investigations.

12   Q. Is that the primary work that you do, sir?

13   A. That is part of the work that I do.

14   Q. And what else is the portions of your work?

15   A. We do prisoner productions and we do protection of the

16   federal judiciary.

17   Q. Thank you, sir.  Deputy Bryce, are you familiar with an

18   individual by the name of Cheryl Little Dog?

19   A. I am.

20   Q. Can you describe your previous interactions with Ms.

21   Little Dog, please?

22   A. I've known Cheryl for several years, mainly after she came

23   onto the council.  The Blackfeet Reservation was having some

24   issues during 2013 and 2014 with the council, and during that

25   time I had the opportunity to have several contacts with her.

1    Also, I've had contact with Cheryl as she was a sitting

2    member on the Blackfeet council.

3    Q. And just as an overall character of Ms. Little Dog, what's

4    been your impression of Ms. Little Dog?

5    A. Cheryl is a very strong and authoritative woman, a proud

6    woman.

7    Q. Thank you, sir.  Deputy Bryce, did you receive information

8    about a fugitive by the name of Frank Gallardo?

9    A. I did.

10   Q. Can you describe for the Court when you became aware of

11   Mr. Gallardo?

12   A. On October 15th, my supervisor notified me that FBI Shelby

13   had a fugitive up in Browning and was requesting some

14   assistance.

15   Q. What did you do at that point?

16   A. At that point, I did a work-up on the fugitive.  I ran the

17   fugitive through NCIC to get a criminal background on him,

18   photographs, and a copy of the warrant.

19   Q. And why do you do all of that, sir?

20   A. Uhm, for fugitive work, you need to know the background of

21   the individual to know what you're up against and what extra

22   manpower you might need, equipment, and that sort of thing.

23   Q. Just in a general sense, after you complete the

24   background, would you treat an individual who has no criminal

25   history and maybe wanted for a white collar offense

1    differently than an individual with a substantial criminal

2    history wanted for a violent crime?

3    A. Yes.

4    Q. Thank you, sir.  You reviewed Mr. Gallardo's criminal

5    history, correct?

6    A. I did.

7    Q. Can you provide the Court just a breakdown of Mr.

8    Gallardo's criminal history, as you remember it?

9    A. Mr. Gallardo had a long history stemming multiple years,

10   the majority of the criminal history was assaults, assaultive

11   behavior.  There was one on there for assault, serious bodily

12   injury, stalking, and there was another one for -- I think a

13   misdemeanor drug and crimes against persons.

14   Q. And in a general sense, how far did this criminal history

15   span?  Was it multiple years, or just one or two years?

16   A. No, it was multiple years.

17   Q. Thank you, sir.  And where did you obtain this criminal

18   history from?

19   A. I pulled it through NCIC.

20   Q. And is that normally where you pull an individual's

21   criminal history?

22   A. That is correct.

23   Q. And it provides a criminal history of both federal and

24   state, correct?

25   A. That is correct.  We do a search for -- the state, also, I

1    can pull up state by doing a search just for the state off

2    his state number.

3                MR. DAKE:  Your Honor, we would move to admit

4    Government's Exhibit 2 with Mr. Bryce.  We are not going to

5    go through it with the Court.  Mr. Bryce has already provided

6    just a breakdown of the criminal history of Mr. Gallardo.

7    Both Government's Exhibit 1 and Government's Exhibit 2 have

8    been redacted to reduce any sort of personal identifiers.  If

9    the Court would like us to go into it, we certainly can, but

10   Mr. Bryce has provided a breakdown.

11               THE COURT:  And Exhibit 2 is Mr. Gallardo's

12   criminal history?

13               MR. DAKE:  It is, yes, Your Honor.

14               THE COURT:  All right.  And that was obtained

15   through the NCIC database?

16               MR. DAKE:  Yes, Your Honor.

17               THE COURT:  All right.  Ms. Cross Guns, any

18   objection?

19               MS. CROSS GUNS:  I just wanted to clarify that this

20   is, in fact, what Mr. Bryce obtained.

21               THE COURT:  Mr. Bryce, this Exhibit Number 2, did

22   you obtain this document, yourself?

23               THE WITNESS:  I did, Your Honor.

24               THE COURT:  When did you do that?

25               THE WITNESS:  This particular is the exact same as

1    what was run.  And it has a database that tells the last

2    time, and it hasn't been updated since I ran it on October

3    15th.  I pulled this one on 4/26/2016.

4              THE COURT:  So, let me clarify.  The document in

5    front of us has a date of April 26th, 2016, is this the same

6    document you had in your possession on April 15th, 2016?

7              THE WITNESS:  Correct, Your Honor.  At the top, as

8    a matter of fact --

9              THE COURT:  Well, let me clarify.  The contents of

10   the document is the same, even though you downloaded this

11   Exhibit 2 twelve -- eleven days later.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Okay.  All right.  Ms. Cross Guns,

14   anything further?

15             MS. CROSS GUNS:  No.  No.

16             THE COURT:  Any objection?

17             MS. CROSS GUNS:  No objection.

18             THE COURT:  All right.  Exhibit 2 is admitted.

19   (Exhibit Number 2 was admitted.)

20             MR. DAKE:  Thank you, Your Honor.

21   BY MR. DAKE:

22   Q. After you reviewed this information about Mr. Gallardo,

23   what did you do after that, sir?

24   A. After that, I contacted Mark Z., the agent that's out of

25   the Shelby office, and we coordinated the time and the

1    location that we were going to meet and the type of equipment

2    we might need.

3    Q. And what day was this that you contacted Special Agent

4    Zahaczewsky?

5    A. That would have been on the 15th.

6    Q. Thank you, sir.  And what did you decide to do, then, on

7    October 16th?

8    A. We decided that we would meet up.  I had court in that

9    morning, so it would be in that afternoon.  I would drive up

10   after court.  And we would have a briefing, and we would

11   coordinate with some locals and attempt to do this warrant.

12   Q. How many individuals did you coordinate with?

13   A. Because of the sensitive nature with Cheryl on the

14   council, we coordinated with Glacier County primarily, and

15   then with BIA.

16   Q. How many officers were present at the initial briefing, if

17   you remember?

18   A. There would have been six.

19   Q. How many individuals went to Ms. Little Dog's residence on

20   that day?

21   A. That day, on the original contact with her, we had six

22   officers, uhm, some at its perimeter and then the main

23   group.

24   Q. Can you tell the Court who those six officers were that

25   were with you?

1   A. Yes.  I had myself, Special Agent Mark Z., Mike Connelly

2   of Glacier County, and two BIA officers, and then one special

3   drug officer from Blackfeet.

4   Q. Thank you, sir.  When you arrived at the house, where did

5   you park?

6   A. I was driving my vehicle, so myself and Special Agent Mark

7   Z., we drove right up into the driveway (indicating).

8   Q. What other cars were parked in front of Ms. Little Dog's

9   residence?

10  A. There was at least, I believe, two other vehicles there.

11  (Nods head affirmatively)

12  Q. And whose vehicle was that, sir?

13  A. Well, one would have been her vehicle.  Uhm, I'm not sure

14  about the other vehicle.

15  Q. Were there any other law enforcement vehicles parked in

16  front of the residence?

17  A. No.  We had one vehicle down the road that was sitting on

18  the front, and then there was a vehicle in the back, in the

19  alleyway.

20  Q. Whose vehicle was out in front?

21  A. I believe that the vehicle out in the front would have

22  been the Glacier County deputy, Mark -- Mike Connelly and his

23  BI -- or his Blackfeet officer.

24  Q. What did you do when you got out of the car?

25  A. Both myself and Mark Z. got out of the car and started up

 1    towards the house.  As we went up to the front of the house,

 2    we noticed a young boy coming out of the house.

 3    Q. Approximately how old was the child?

 4    A. Six, seven years old, is what I would have said.

 5    Q. Did you have an interaction with this child?

 6    A. Mark Z. had the first interaction, started talking to him

 7    and asked him some questions.  And then after that, I asked

 8    him to look at a photograph.

 9    Q. Where did you have a photograph?

10    A. I had a photograph on my phone.

11    Q. And, so, what did you say to the boy?

12    A. I said, "Is this the individual or is this the man in the

13    house?"

14    Q. And what did the boy say to you?

15    A. "That's him."

16    Q. Did you say anything else to the boy?

17    A. I did not.

18    Q. What did you do at that point, then?

19    A. We headed to the front door.

20    Q. And the picture you showed him, was it a small picture, a

21    big picture?  About how large was the picture that you showed

22    to the child?

23    A. Well, it was the size of an iPhone screen, so what is

24    that?  Five, five-three, or something like that.

25    Q. Okay.  Thank you.  And it filled up the entire screen?

1    A. It did.

2    Q. Would the child have been able to see the photograph

3    fairly clearly on your phone?

4    A. It was a very good photo.

5    Q. Thank you.  You approached the house, what happened next,

6    then, sir?

7    A. During the time that we were talking to the juvenile, we

8    did hear the door lock, like somebody was locking the top bar

9    on the door.  Mark knocked once lightly.  We waited quite a

10   bit of time.  He knocked a second time.  We waited quite a

11   bit of time.  Knocked a third time.  There was no response.

12   At that time, then, I knocked very heavily on the door.

13   Q. What did you say when you knocked?

14   A. I said, "Cheryl, come to the door or I'm going to kick it

15   in."

16   Q. What happened after that?

17   A. We could hear somebody from behind the door in a woman's

18   voice saying, Wait a minute and -- or, "Hold on," and the

19   door opened fairly quickly after that.

20   Q. Were you knocking on a screen door or an actual interior

21   door?

22   A. Interior door.

23   Q. All right.  And what was --

24   A. It did have a screen door, though.

25   Q. Did you have the screen door open at that time?

1    A. Yes, I did.

2    Q. What happened when Ms. Little Dog came to the door?

3    A. She unlocked the door and opened the door widely.  I was

4    the first in the door.  And I said, Cheryl, we need to talk

5    about -- or "I'm looking for Frank Gallardo," is what I said

6    as I was coming into the house.  Cheryl said, "He's not

7    here."  Uhm, at that time, we started to move into the living

8    room and I started talking to Cheryl.

9    Q. Did Cheryl invite you inside of the house into the living

10   room area?  How did that happen?

11   A. Well, as she opened the door, I came into the doorway

12   right there.  She started to move backwards, back into the

13   living room as I was talking to her, and we both moved into

14   the living room.

15   Q. Was she talking with you at that same time?

16   A. Yes, she was.

17   Q. You moved into the living room with her, can you describe

18   what happened while you were in the living room?

19   A. I sat down beside her.  She was in her wheelchair, and I

20   started conversing with her.  At that time, Mark moved into

21   the hallway and stopped there.  I think Mikey might have went

22   to the right towards the kitchen area, and I started talking

23   to Cheryl at that time.

24   Q. So, there were a total of three officers inside of the

25   house?

1  A. Yes.

2  Q. Can you talk to us about the guns.  Did you have your gun

3  out, sir?

4  A. I do not believe at that time I had my gun out.  I think I

5  had my taser out in the original part.  Mark had his handgun

6  out, definitely.

7  Q. And what about Officer Connelly?

8  A. (Nods head affirmatively)  Officer Connelly had his gun

9  out.

10  Q. So, two guns were out, and you had your taser out?

11  A. I believe I had a taser out.

12  Q. When you went into the living room to talk with Ms. Little

13  Dog, did you have your taser still out, or had you put it

14  away?

15  A. No, I had put it away.  Because I had sat down to converse

16  with her.

17  Q. What did you talk to Ms. Little Dog about?

18  A. I tried to explain to her that we were here for Frank and

19  we were looking for him and we had reason to believe that he

20  was in the house.  She steadfastly denied that he was in the

21  house, said, "He's not here.  He left a couple days ago."  I

22  think she said he left on Wednesday.  And during that

23  conversation, I pressed her, and she said, "Well, he's not

24  here, you can look."  We started looking and searching.  I

25  talked to her about this is important, it's not about her,

1    it's about Frank and finding him, and that he had a valid

2    warrant and that he was a dangerous man.

3    Q. What was Ms. Little Dog's demeanor like during this

4    time?

5    A. (Pause)  Her demeanor was like I had never encountered it

6    before.  It was very cooperative, nice, pleasant, very

7    helpful.

8    Q. That was different than your previous interactions with

9    her?

10   A. Yes.

11   Q. What did she tell you about as far as searching the house?

12   Did she say that it was fine to search?

13   A. She said that he wasn't there and you can look, but we

14   didn't touch on that any more than that.

15   Q. What happened after that point?

16   A. Uhm, while they were going through the house, uhm, I was

17   talking to her about Frank, the warrant, and that this was a

18   serious thing, she has kids in the house, he was wanted for a

19   sex crime against children, and that she needed to tell me

20   the truth and not lie to me.

21   Q. As the search progressed in the house, did she become

22   nervous or anxious while you were sitting with her?

23   A. No, never.

24   Q. Did she ever tell you to stop searching?

25   A. No.

1    Q. What happened next, then, sir?

2    A. We continued to talk about Frank, how long he was there,

3    uhm, when he had left, how she could get ahold of him.  Uhm,

4    she had said that she went to work on Wednesday morning, and

5    when she got home Wednesday afternoon, he was no longer

6    there.  And that was the last time that she saw him, was that

7    Wednesday morning before she went to work.

8    Q. For clarification, what day of the week was this search?

9    A. (Pause)  (Indicating)  I think it was a Thursday.

10   Thursday?

11   Q. Okay.

12   A. The days run together.  (Shakes head negatively)

13   Q. I understand.  The date, though, was October 18th,

14   correct, sir?

15   A. The date of the search was going to be the 16th.

16   Q. I apologize.  October 16th was the day of the search.

17   A. Yes.

18   Q. Thank you, sir.

19   A. I can't remember if it was a Thursday or a Friday at this

20   point.

21   Q. After this interaction with Ms. Little Dog, what happened

22   next?  Did you find Mr. Gallardo in the house?

23   A. No, we did not find Mr. Gallardo.

24   Q. What did you do at this point?

25   A. At this point, we finished up.  We gave her a card.  I

1    attempted to get her to call him.  She attempted to try to

2    call him for me.  (Shakes head negatively)  Uhm, that was not

3    successful.  She was (shakes head negatively) very helpful in

4    this regard.  And we had some small talk, and we left the

5    house.

6    Q. Where did you go after leaving the house?

7    A. All of us went down to the C Store.  We went down there,

8    met up down at the C Store.  We talked about what went on

9    with the search and that something just was not right.

10    Q. Why did you think something wasn't right?

11    A. The fact that the child positively identified that he was

12    in that house.  And, specifically, for me, Cheryl's demeanor

13    and the way she acted towards me and with me just did not add

14    up.  We had missed this guy.

15    Q. What did you decide to do at that point?

16    A. So, we talked briefly, and we decided together that we had

17    missed this guy, with myself and Mark, and we traveled back

18    to her residence.

19    Q. And who all was with you at this time?

20    A. Everybody else stayed away.  It was just myself and Mark.

21    We both went up to the house.  We knocked on the door.

22    Cheryl invited us in.

23          THE COURT:  Hold on, Mr. Bryce.  Let me interrupt

24    you for a minute.

25          THE WITNESS:  Yes, sir.

```
 1              THE COURT:  How long did it take you to drive from
 2   Ms. Little Dog's house to the C Store?
 3              THE WITNESS:  Your Honor, it's like two blocks
 4   away.  I bet we weren't there more than five or six
 5   minutes.
 6              THE COURT:  You were at the C Store five or six?
 7              THE WITNESS:  Yeah.  If that, Judge.
 8              THE COURT:  And how long back to Ms. Little Dog's
 9   house?
10              THE WITNESS:  We went straight there.  So, like I
11   say, it's two blocks.
12              THE COURT:  So, total, how long from the time you
13   left her house until you returned to her house?
14              THE WITNESS:  Well under ten minutes.
15              THE COURT:  Okay.
16              THE WITNESS:  I would say somewhere in the
17   eight-minute range.
18              THE COURT:  Go ahead, Mr. Dake.
19              MR. DAKE:  Thank you, Your Honor.
20   BY MR. DAKE:
21   Q. You approached the house, did you have your firearms drawn
22   when you approached the house?
23   A. No, we did not.
24   Q. Did you have your firearm on you?
25   A. Yes.
```

1    Q. Did Special Agent Zahaczewsky have his firearm on him?

2    A. Yes.

3    Q. And when you went up to the house, did you knock on the

4    door?

5    A. We sure did.  I did.

6    Q. And what did you say when you knocked?

7    A. Well, I knocked.  I believe Cheryl said, Come in.  We went

8    into the house.  I explained to her that we had missed

9    something, we needed to talk.

10   Q. And, so, let's back up for just one moment, Deputy Bryce.

11   You knocked on the door and she said, "Come in," did she open

12   the door for you?

13   A. She opened the door for us, yes.

14   Q. And then you entered the house?

15   A. Yes.

16   Q. Where did you go at that point?

17   A. Right back to the living room where we were earlier in the

18   day.

19   Q. Did you have your firearm drawn at this point?

20   A. No.

21   Q. Did Special Agent Zahaczewsky have his firearm drawn?

22   A. No.

23   Q. What did you do at this point?

24   A. I started talking to Cheryl.  I explained to her that,

25   "You know what?  Something is just not matching up."  And I

1    asked her if there was a crawlspace in the house, and she

2    told me, "No."  I explained to her that right behind her

3    where her seating arrangement was for her wheelchair that

4    there was a vent in the floor, I said, "Well, there is a vent

5    there, there must be a crawlspace, and do you know where the

6    hatch is?"  And she responded, "Well, it must be in the kids'

7    room, go look."  At that time, we all moved to the kids'

8    room.

9    Q. And who all went to the kids' room?

10   A. Myself, Mark Z., and Cheryl.

11   Q. And what happened when you got into the kids' room area?

12   A. Uhm, Mark was over to the left.  I went into the closet

13   area.  Cheryl was right in the doorway.  And we started to

14   look for the hatch.

15   Q. And did you find the hatch?

16   A. We did.

17   Q. And where was it located?

18   A. It was in the corner of the closet.  It had been covered

19   up with loose clothing and an empty suitcase.

20   Q. What was Ms. Little Dog doing at this time?

21   A. Well, she was right there with us in the doorway.  She had

22   been talking.  And I'm not really sure what she said, it

23   didn't register with me.  I was more focused on the

24   crawlspace.

25   Q. Did she ever tell you at any point to stop searching?

1    A. No.

2    Q. When you found the crawlspace cover, what did you do?

3    A. I pointed out to Mark Z., who was on the phone, that you

4    could see that there was loose clothing -- the hatch was

5    closed, but it wasn't permanently closed.  Whomever had

6    closed it had done so in a hurry, so there was loose clothing

7    stuck in between the hatch lid and the bottom of the floor.

8    Q. What did you do at that point, then?

9    A. Mark got off the phone, and we both put our attention to

10   that.  We opened -- I opened up the hatch -- or we opened up

11   the hatch and looked down into the crawlspace, and you could

12   see loose clothing down on the ground.  And there was -- I

13   think it was a pink bra.

14   Q. What did you do after you saw that pink bra in the

15   crawlspace area?

16   A. I told Mark Z. that I was going to go down into the

17   crawlspace.

18   Q. And once you were down in the crawlspace, who did you

19   locate?

20   A. Ultimately, we located Frank in the crawlspace.  (Nods

21   head affirmatively)

22   Q. At any of the time prior to going into the crawlspace or

23   once you were inside of the crawlspace, did Ms. Little Dog

24   tell you to stop searching?

25   A. Never.

1   Q. What happened when you came out of the crawlspace with Mr.

2   Gallardo?

3   A. Uh, he was arrested, and we moved him away.  Uhm, at that

4   time, I believe we moved him outside.  Mark talked briefly

5   with Cheryl and -- yeah, Mark was talking briefly with

6   Cheryl, and then I was outside getting him into the

7   Suburban.

8   Q. Was Ms. Little Dog in custody at this point?

9   A. Ms. Little Dog, after we found the fugitive in the

10  crawlspace, was put in cuffs.

11  Q. And why is that, sir?

12  A. For safety.  For officers' safety.  We ended up finding

13  the fugitive after all of that in her crawlspace; and until

14  we got things sorted out, she was put in cuffs.

15  Q. Did you have a conversation with Special Agent Zahaczewsky

16  about whether Ms. Little Dog would be arrested?

17  A. We talked briefly about that as far as maybe for harboring

18  a fugitive and that sort of thing.  I kind of left that up to

19  Mark to deal with, and I went and dealt with the fugitive.

20  Q. And what was the ultimate decision, if you know, about

21  whether Ms. Little Dog was arrested for a federal offense at

22  that point?

23  A. At that point, we had decided no.  Yes.

24  Q. Was she later arrested by tribal law enforcement?

25  A. She was later arrested by tribal.

1  Q. When did you become aware of that?

2  A. Uhm, after Mark got done doing an interview, while he was

3  in doing an interview with Cheryl, uhm, the tribal law

4  enforcement officers called their chief of police and called

5  members of the tribal council and decided that she would be

6  arrested for this.

7  Q. Did you make that decision to arrest Ms. Little Dog?

8  A. I did not.

9  Q. Deputy Bryce, if Ms. Little Dog had not consented to this

10  search, what would you have done?

11  A. If she would not have come to the door and opened the door

12  for us to go into the house or if she would have denied entry

13  to the house, we would have had to rethink what we were going

14  to do.  We would have had two options:  We could have either

15  went and got a warrant, or we could use exigent circumstances

16  to continue on in the house.

17  Q. What exigent circumstances were there, sir, that made you

18  think of that?

19  A. There were multiple, actually.  Number one, the criminal

20  history of Frank Gallardo.  Number two, talking to the small

21  child, knowing that there were children in the house, this

22  guy was charged with a sex offense against children, and he

23  had a large number of crimes against people gave me a lot of

24  thought.  When the child identified positively to us that

25  this individual was in that house and then the door instantly

locked while we were in front of that house, knowing that law

enforcement were there, gave me considerable concern.

Q. Did you also consider Ms. Little Dog's physical

condition?

A. I did.  Because we knocked and we knocked.  We knew that

she was in there because of the child's statement, and then

we never heard anything.  So, at that time, as I was standing

at the door, uhm, there could have been a possibility that

the fugitive (indicating) was not allowing her to come to the

door.

Q. At any time, with your interaction with Ms. Little Dog in

either the first or the second search, was she nervous or did

she ask you to leave?

A. Never.  Actually, she was more than helpful through all of

it.

Q. Was there ever a time that she seemed anxious or upset by

law enforcement being present in her house?

A. Not even in the least.

          MR. DAKE:  A moment please, Your Honor?

          THE COURT:  A moment.

          MR. DAKE:  Thank you.

(Discussion off the record.)

          MR. DAKE:  No further questions, Your Honor.

          THE COURT:  Ms. Cross Guns.

          MS. CROSS GUNS:  Thank you, Your Honor.

|    |    |
|----|----|
| 1  | CROSS-EXAMINATION |
| 2  | BY MS. CROSS GUNS: |
| 3  | Q. Can I call you "Logan"? |
| 4  | A. You sure can, Roberta. |
| 5  | Q. Thank you. |
| 6  | A. Thank you. |
| 7  | Q. I've known you long enough, I -- |
| 8  | A. Yes, ma'am. |
| 9  | Q. -- feel more comfortable that way.  I want to explore a |
| 10 | couple of things.  First of all, I want to talk about the |
| 11 | child.  And I want to know, did you identify yourself to him |
| 12 | as law enforcement or anything like that? |
| 13 | A. Both -- yes, ma'am. |
| 14 | Q. Okay.  All right.  So, he knew you were law enforcement. |
| 15 | A. There was no doubt that we were law enforcement. |
| 16 | Q. Well, did you tell him that? |
| 17 | A. We both had tactical vests on that said, "Police," "U.S. |
| 18 | Marshal," "FBI," and there was no way to not know that we |
| 19 | were law enforcement. |
| 20 | Q. Okay.  Do you know if he can read? |
| 21 | A. He might not be able to read.  I don't know that.  (Shakes |
| 22 | head negatively)  But I had a great big badge, and he can't |
| 23 | miss that. |
| 24 | Q. Okay.  All right.  Very good.  So, I want to talk a little |
| 25 | bit about your relationship with Cheryl.  You indicated that |

1   her behavior at her home was different than other encounters

2   that you had had with Ms. Little Dog, can you tell me a

3   little bit about previous encounters?  What were the nature

4   -- what was the nature of those?

5   A. Some of those encounters were, uhm, (pause) aggressive, I

6   guess.  Not for me, but her dealing with law enforcement and

7   other people in the community.  During the 2013 year, in the

8   fall of 2013 there was a lot of uprising, upheaval in the

9   council, and a lot of that time was with Cheryl being on one

10  side of the council, and the other side of the council being

11  split, and that created a lot of problems that the local law

12  enforcement was dealing with.  That was a lot of the context

13  that I had had with -- I had observed her in during that

14  time.

15  Q. Okay.

16  A. Other times have been with the law and justice meetings

17  within the council, itself.  Cheryl tended to be very sure of

18  herself, vocal and outgoing during those meetings in many

19  areas.

20  Q. Authoritative, as you said.

21  A. Yes, ma'am.

22  Q. Okay.  Had you ever been to her house before?

23  A. (Pause)  I do not believe so.  (Shakes head negatively)

24  Q. So, the context of your previous encounters involved

25  politics.  Would it be fair to say that?

A. Not always politics.  Even on the council side, it would

be, say, (indicating) we did training before with the

council.  And that had nothing to do with politics at the

time, it was straight-up training.  And she could -- she was

a very forceful person (nods head affirmatively) in her

views.

Q. Okay.

        THE COURT:  Let me clarify, Ms. Cross Guns.

        MS. CROSS GUNS:  Thank you.

        THE COURT:  So, Mr. Bryce, Ms. Cross Guns used the

word "politics," is it fair to say that your previous

encounters with Ms. Little Dog involved -- that she was

serving in her official capacity?

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  You had no previous dealings with her,

where you were law enforcement and she was the subject of any

kind of investigation or encounter.

        THE WITNESS:  No, sir.

        THE COURT:  Okay.  Go ahead.

        MS. CROSS GUNS:  That's exactly what I wanted to

know.

BY MS. CROSS GUNS:

Q. I want to ask you a little bit about the firearms.  So,

when you knocked forcefully on the door, finally, and said

that, "I'm going to kick the door in," when she came to the

1    door, then, did you have some weapon in your hand?

2    A. Yes, ma'am.

3    Q. What did you have?

4    A. I believe I had my taser.

5    Q. Okay.  And how do you hold that when you're going into

6    somebody's house, when you're feeling threatened?

7    A. Usually, it's -- if I'm going into the house, it would be

8    midsection on my vest (nods head affirmatively) held close to

9    my chest.

10   Q. And you use both hands (indicating)?

11   A. No.

12   Q. Just one?

13   A. In that case, I would not have used both hands, if it was

14   a taser.

15   Q. Okay.  And, so, you would be pushing the door open with

16   the taser in the other hand?

17   A. I didn't have to push the door open.

18   Q. Okay.  Okay.  Very good.  Was there any time while you

19   were there that others had firearms drawn?

20   A. During the first encounter, everybody had firearms

21   drawn.

22   Q. Okay.  And how many -- when you say "everybody," how many

23   is that?

24   A. That would have been initially three.  I think a fourth

25   finally showed up a little later in the operation.

```
 1   Q. So, at some point there were four firearms drawn during
 2   the search; is that correct?
 3   A. Yes.
 4   Q. And, so, as they are going around the house with their
 5   firearms drawn, how does that look?  I've never had this
 6   happen to me, so I don't know.  Are they -- you know, I watch
 7   TV and I see them, you know, going around corners like this
 8   (indicating) and, you know --
 9   A. It's coordinated.
10   Q. Okay.  So explain that to me.
11   A. Well, as I was sitting down right next to Cheryl talking
12   to her, the officers would have been working as pairs to
13   clear the rooms.  They were seeking a very dangerous
14   individual, and so they used a vehicle of safety unto
15   themselves.
16   Q. Okay.  So, at that point you -- you say he was "a very
17   dangerous individual;" but when you went back the second
18   time, there were no guns drawn, why not?
19   A. That is correct.  Because the second time we were acting
20   on what both Mark and I thought was -- (shakes head
21   negatively) we knew that we had missed this guy, but (nods
22   head affirmatively) we were giving Cheryl the benefit of the
23   doubt.  We knocked.  She invited us in.  We told her what was
24   going on, and she allowed us to do what we did.
25   Q. My point being that if you believed him to be in the house
```

1    even then, why didn't you have your guns drawn?

2    A. Because Cheryl -- for multiple reasons.  Cheryl is a

3    councilwoman at the time.  She is in a wheelchair.

4    Q. Uh-huh.

5    A. And we did not want to raise the level any higher than it

6    already was.

7    Q. Okay.

8    A. And if she would not have let us in, then we would have

9    had to go our separate ways.

10   Q. Okay.

11   A. Although, I will tell you that, you know, that would have

12   been it.  (Nods head affirmatively)

13   Q. Okay.  So, in this instance if you had gotten an actual

14   search warrant to go into her house, the procedure on a

15   search warrant, if you go in the first time and you don't

16   find what you're looking for, can you return on that same

17   warrant, or do you have to go get a new warrant?

18   A. (Pause)  I'm not really sure on the answer to that

19   question.  I believe that if I had -- (shakes head

20   negatively).  I -- (shakes head negatively) that's a good

21   question.

22   Q. So, in other words, if you went the first time, whether

23   the guns are drawn or not, I don't care, but you have a

24   warrant, a valid search warrant, and you don't find what

25   you're looking for, and you leave and you reconvene at the C

1   Store and five minutes later come back, can you rely on that

2   same warrant?

3   A. That wasn't the case here.

4   Q. But let's say it was.

5   A. That's a hypothetical.

6   Q. Okay.  (Nods head affirmatively)  I want to talk about

7   locking the door.

8   A. Okay.

9   Q. Have you ever been to Cheryl's house before?  I think you

10  said no.

11  A. No.

12  Q. Okay.  Do you know whether it is her practice as a person

13  in a wheelchair to lock the door when people come and go?

14  A. No.

15  Q. Is there a window in her door?

16  A. Well, there's a screen in her door.  I believe there was a

17  window.

18  Q. In the door to the house that you were banging on

19  (indicating)?

20  A. I do not believe there was, no.

21  Q. Is there a peephole so she could look out and see who is

22  there?

23  A. Well, if it was, it would -- she was in a wheelchair, that

24  would be pretty tough for her.

25  Q. It would have to be low, wouldn't it?  Okay.  So, you

1  don't know, as we sit here today, whether it's her practice

2  to lock the door, and whether she even knew for sure who was

3  at the door.

4  A. As answered before, no.  (Shakes head negatively)

5  Q. (Nods head affirmatively)  When you -- you testified

6  earlier that you went and assessed options, can you explain

7  what you mean by that?

8  A. I believe the question was, if my memory serves me right,

9  counsel asked me whether or not -- if we would not have

10  gained entry, what would you do?  I would have researched

11  options.  We didn't do that.

12  Q. Okay.  I want to talk a little bit about the

13  dangerousness, because you kind of raised it when you talked

14  about the criminal history.  Do you have a copy of this?

15  A. I do not.

16         MS. CROSS GUNS:  Can we -- you put it on the

17  screen?

18         THE COURT:  What is "this"?  The --

19         MS. CROSS GUNS:  "This" is Exhibit --

20         THE COURT:  1?

21         THE WITNESS:  2.

22         MS. CROSS GUNS:  2.

23         THE COURT:  2.  Okay.

24  BY MS. CROSS GUNS:

25  Q. And I'm going to ask that we go to Page 10.  These

1    criminal histories are always a surprise to me to try to

2    read.  But I see at the top of Page 10, we have a charge of

3    marijuana possession, and it appears to be in 1995; is that

4    correct?

5    A. Yes, ma'am.

6    Q. Okay.  And it doesn't show how that was resolved, it just

7    says "charged," correct?

8    A. That's correct.

9    Q. Then in 1996, actually just a few months later, we have an

10   assault that shows up in Pueblo, Colorado, but it says he's

11   arrested for another jurisdiction.  Do you see that?

12   A. Yes, ma'am.

13   Q. And, that, right after that, if you see where it says

14   "charged literal," it says "assault," and then it says,

15   "statute, assault, 1399."  Do you see that?

16   A. Yes, ma'am.

17   Q. Then if you jump down the page to Cycle 3, it shows

18   assault in Denver.  Is that the same charge, and is this the

19   other jurisdiction for which he was arrested?

20          THE WITNESS:  Scroll back up a little bit?  You

21   notice the arrest date was 1996 on that one.

22   BY MS. CROSS GUNS:

23   Q. I do.

24   A. The arrest date on Cycle 3 is 1997.  Totally different

25   charge, different date.

1    Q. Well, except that it said that it was an arrest for

2    another jurisdiction, so that -- it's just unclear.  We don't

3    know (indicating) if they are separate charges.

4    A. They are separate charges.

5    Q. Okay.

6    A. I'm pretty sure.

7    Q. Okay.  So, then, in '97, another assault, in your opinion.

8    So, two assaults and a marijuana.  That's in '97.  And,

9    again, it doesn't show how that was resolved.  But we go to

10   2010, now three years later.  Yes?

11   A. Yes, ma'am.

12   Q. Shows the crimes against person, a misdemeanor.  And then

13   2011, misdemeanor, crimes against person, and then it says --

14   it actually has a disposition, "Dismissed by the DA."

15   Correct?

16   A. Yes, ma'am.

17   Q. Okay.  And it's really unclear whether these are all of

18   the same event and whether they are -- they come out in what

19   is called Cycle 4.  So, it's unclear whether the disposition,

20   then, in 2011 was for the charge we see in 2010, because it

21   was September, it was resolved in January.  Is that correct?

22   A. That is correct, but they are separate.

23   Q. How can you tell?

24   A. The arrest date, the arresting agencies.  If we look at

25   case numbers.

1    Q. Oh.  So, show me the arrest date for the 2011.

2    A. Is that back up at Cycle 4?

3    Q. These are all in Cycle 4.

4    A. (Viewing document)

5    Q. They appear to be the same event.

6    A. Well, the case numbers and the docket numbers aren't

7    alike.  So, --

8    Q. Well, I don't see --

9    A. I can't say one way or another.  When it's entered into

10   the NCIC, that's good enough for me.

11   Q. Okay.  So, but they said here --

12   A. That means that person had been printed for this charge at

13   one time or another, and charged with this at one time or

14   another.

15   Q. Right.

16   A. Which is usually how they end up getting onto the NCIC.

17   They are arrested, they are charged, they are printed, and

18   that makes the entry into NCIC.

19   Q. Okay.  But you see all of these are the same charge, and

20   it says it's dismissed by the DA.  It's all in Cycle 4.  They

21   are just a few months apart on the arrest date and the

22   disposition date.  It appears to be the same event, and it

23   was dismissed.

24   A. Okay.

25   Q. Okay.  So, in 2012, we have the next assault, which is, I

1    believe, the one that the warrant was issued for.  Because

2    it's Pueblo, it's about the right time, and I don't see

3    anything new after that.

4    A. Actually, the assault that's for -- this warrant wasn't

5    out of Pueblo, it was going to be a federal charge for sexual

6    abuse of a minor.  Not this serious bodily injury or this

7    assault or this reckless cause of injury.

8    Q. Well, it's my understanding that there was another warrant

9    and that it came out of Pueblo.  Am I misunderstanding

10   that?

11   A. Yeah.  I believe it's still open.

12   Q. Okay.  Okay.  So, out of these as you called it or

13   describe it as "several years," there's really only about

14   three or four charges.

15   A. Correct.  On this current case, though, with their

16   interaction with him fleeing his jurisdiction where the crime

17   took place, we received information from the FBI in that

18   jurisdiction that he had had a gun and he had fled from the

19   local police on multiple occasions right before this

20   arrest.

21   Q. Right before the October --

22   A. Right before we arrested him, correct.

23   Q. Before you arrested him.  Okay.

24   A. And that is information that we take into account when

25   setting up an operation for an arrest.

1  Q. You know, there was some testimony before, and now you've

2  raised it, with regard to the fleeing, do you know any of the

3  circumstances of that?

4  A. No, ma'am.

5  Q. Do you know if it was related to the other -- the warrant

6  it charged, or, I mean --

7  A. No, ma'am.

8  Q. Okay.  And do you know what kind of a firearm it was?

9  A. No, ma'am.

10  Q. And do you know if it was discharged towards anyone?

11  A. I do not know.

12  Q. Okay.  So, when you first went there, you had a lot of

13  firearms drawn and describe it as, perhaps, exigent

14  circumstances, but when you go back, there is none.

15  A. We didn't have exigent circumstances.  She let us in on

16  the first go.

17  Q. Okay.  (Nods head affirmatively)  And like you said, you

18  know Cheryl, you know she is in a wheelchair, you know she

19  has difficulty getting around, do you think it might be a

20  little intimidating for her to hear you say you are going to

21  kick her door in?  A little frightening?

22  A. No, I don't.

23  Q. And you don't think it would be frightening for people to

24  come filing through the house with weapons drawn?

25  A. It could be, yes.

1    Q. Do you think it was for Cheryl?

2    A. No.

3              MS. CROSS GUNS:  Thank you.  I have nothing

4    further.

5              THE COURT:  Redirect, Mr. Dake.

6              MR. DAKE:  Thank you, Your Honor.

7                     REDIRECT EXAMINATION

8    BY MR. DAKE:

9    Q. Deputy Bryce, I would like to discuss the firearms.  Your

10   firearm was never out when you were talking to Ms. Little Dog

11   in the living room, correct?

12   A. It was not.  (Shakes head negatively)

13   Q. Either the first or the second time?

14   A. No.  (Shakes head negatively)  Neither.

15   Q. Thank you.  Ms. Cross Guns asked you about the officers

16   who were searching the residence, and they had their firearms

17   out, correct?

18   A. Yes, sir.

19   Q. Did Ms. Little Dog appear nervous at the firearms being

20   drawn during this time?

21   A. No, sir, not at all.

22   Q. When you came back to the house for the second search, you

23   had already cleared the house; is that correct?

24   A. Yes, sir, we had.

25   Q. And the only place that you hadn't checked was in the

1  crawlspace area?

2  A. Yes, sir.

3  Q. When you entered the crawlspace area, did you take your

4  gun out at that time?

5  A. Yes, sir, I did.

6  Q. But that was the only time during the second encounter

7  that you had your firearm out?

8  A. That is correct.   (Nods head affirmatively)

9  Q. Deputy Bryce, how long have you been a United States

10  Marshal?

11  A. Over 19 years.

12  Q. How many criminal histories have you reviewed during that

13  time period?

14  A. Hundreds.

15  Q. Do you assess and investigate the disposition of every

16  offense that is on a criminal history?

17  A. No, sir, because I understand how they get there.   (Nods

18  head affirmatively)

19  Q. And in your assessment of Mr. Gallardo's criminal history,

20  what did you determine?

21  A. He was a violent individual.   (Nods head affirmatively)

22          MR. DAKE:  Thank you very much.  No further

23  questions, Your Honor.

24          THE COURT:  Ms. Cross Guns.

25          MS. CROSS GUNS:  Can I ask another question?

1              THE COURT:  You may.

2              MS. CROSS GUNS:  Thank you, Your Honor.

3                        RECROSS-EXAMINATION

4    BY MS. CROSS GUNS:

5    Q. You were just asked if you had cleared the house at the

6    end of the first search and then you came back without guns

7    because you had cleared the house, you don't believe in those

8    five minutes or eight minutes, or however many minutes, that

9    if Frank had been there he couldn't have come out from

10   wherever he was hiding?  Because you clearly believed he was

11   still in the house.

12   A. (Pause)  What is the question?

13   Q. The question is did you just not believe he was dangerous

14   anymore?

15   A. No.  Out of respect to your client, we took the higher

16   road, and we (nods head affirmatively) took a road less safe

17   for us out of respect for her.

18              MS. CROSS GUNS:  Okay.  Thank you.

19              THE COURT:  Anything else, Mr. Dake?

20              MR. DAKE:  No, thank you, Your Honor.

21              THE COURT:  The witness excused?

22              MR. DAKE:  He is.  Thank you, Your Honor.

23              THE COURT:  You may step down, Mr. Bryce.  Thank

24   you.

25              THE WITNESS:  Thank you, Your Honor.

```
 1              THE COURT:  Mr. Dake, your next witness.

 2              MR. DAKE:  Your Honor, the United States has no

 3  further witnesses.

 4              THE COURT:  Thank you, Mr. Dake.

 5          Ms. Cross Guns, are you going to call any witnesses?

 6              MS. CROSS GUNS:  No.

 7              THE COURT:  Okay.  Mr. Dake, do you want to make

 8  argument?

 9              MR. DAKE:  Thank you, Your Honor.

10          Your Honor, in our response brief we've outlined,

11  certainly, the issue that's plaguing the Court here, and,

12  basically, it's whether or not the search of a third party's

13  residence with an arrest warrant is lawful when there is

14  consent given, or, in the alternative, whether there are

15  exigent circumstances.

16              THE COURT:  So, you would agree that if there is no

17  consent, there is no exigent circumstances, a warrant is

18  required to search a third party's home, even when you're

19  trying to execute an arrest warrant.

20              MR. DAKE:  For an arrest warrant, yes, Your Honor.

21              THE COURT:  Okay.

22              MR. DAKE:  That is clearly stated, and that's the

23  law that's specifically laid out in the Steagald versus

24  United States case, which I believe is 1970s or '80s.

25              THE COURT:  Okay.  So, do you believe the officers
```

1    had consent for the first search?

2              MR. DAKE:  Yes, Your Honor.

3              THE COURT:  All right.  And where did that come

4    from?

5              MR. DAKE:  So, the consent happened, quite frankly,

6    Your Honor, when Deputy Bryce, as he has just testified, went

7    inside of the house.  First of all, the door was opened by

8    Ms. Little Dog.  She opens the door, she allows them to come

9    into the residence and sits down with Deputy Bryce at that

10   time.

11       She talks to Deputy Bryce.  Deputy Bryce explains why he

12   is at the residence and what they are doing there.  And they

13   explained to her, quite frankly, that they are not there

14   looking for her or anything that she has going on, that they

15   are looking for him (indicating).

16             THE COURT:  All right.  Let me stop you.  Officers,

17   several with guns drawn and one with a taser, knock on the

18   door.  Ms. Little Dog opens the door inward, allows the

19   agents to enter the house.

20             MR. DAKE:  Yes, Your Honor.

21             THE COURT:  That's what happened, you're telling

22   me.

23             MR. DAKE:  Yes, Your Honor.

24             THE COURT:  All right.  Now, at what point does the

25   agent ask Ms. Little Dog, "Can we search your house?"

```
 1          MR. DAKE:  That doesn't happen until Deputy Bryce
 2   sits down with Ms. Little Dog.  And then you heard the
 3   testimony of Special Agent Zahaczewsky, which is he came into
 4   the hallway area and was calling out to Mr. Gallardo, in --
 5   while he was standing in the hallway, but was waiting until
 6   he heard what he was going to do next.
 7      And, as he stated in his testimony, he overheard the
 8   conversation between Deputy Bryce and Ms. Little Dog, showing
 9   that Ms. Little Dog was compliant.  At that point, they
10   decided to search.
11          THE COURT:  All right.  Hold on.  She was
12   compliant.  What does that mean?
13          MR. DAKE:  That was what was described by Special
14   Agent Zahaczewsky and Deputy Bryce.
15          THE COURT:  Well, I took pretty careful notes.
16   What I have is Mr. -- or Mr. Zahaczewsky testified that he --
17   or, I'm sorry, Mr. Bryce testified that when the agents came
18   on the first search, they came into the house, explained the
19   purpose of their visit, about Mr. Gallardo's presence --
20   possible presence.
21      Mr. Bryce testified that Ms. Little Dog stated, "He
22   isn't here.  You can look."
23          MR. DAKE:  Yes, Your Honor.
24          THE COURT:  All right.  So, that strikes me as some
25   kind of consent.
```

 1              MR. DAKE:  Yes, Your Honor.

 2              THE COURT:  All right.  Now, the search ends.

 3              MR. DAKE:  It does, yes, Your Honor.

 4              THE COURT:  The agents leave the house.  And as Mr.

 5    Zahaczewsky testified, they left it unsecured.  Everyone

 6    left.  No one was there to -- no police tape up, no one was

 7    there to secure the house.  Do you agree?

 8              MR. DAKE:  Yes, Your Honor.

 9              THE COURT:  All right.  Now, I'm not going to hold

10    Mr. Zahaczewsky to a legal standard, he testified it was his

11    understanding that when they left -- if they had a warrant

12    for the first search, that, when they left, they would need

13    to get a new warrant to come back.  And Mr. Bryce equivocated

14    that he's not a lawyer, he wouldn't know that, but I think

15    that's the law.

16              MR. DAKE:  It is, yes, Your Honor.

17              THE COURT:  Okay.  You agree with that.

18              MR. DAKE:  We do.

19              THE COURT:  Now, we have a returned visit by

20    Mr. Bryce and Mr. Zahaczewsky, and where in the record do we

21    have affirmative consent from Ms. Little Dog?

22              MR. DAKE:  And can I answer that question after I

23    address one point, Your Honor, --

24              THE COURT:  You may.

25              MR. DAKE:  -- regarding the warrant aspect?

 1             THE COURT:  You may.

 2             MR. DAKE:  The warrant aspect, quite frankly, Your

 3     Honor, they wouldn't have been able to obtain a warrant in

 4     that -- for that first search.  They didn't have probable

 5     cause, necessarily, at that point.

 6             THE COURT:  Well, we have consent.

 7             MR. DAKE:  Right.

 8             THE COURT:  We have a consent.  That's an

 9     exception.  But there is testimony, unrefuted by Mr. Bryce,

10     that Ms. Little Dog stated, "He isn't here.  You can look."

11             MR. DAKE:  Yes, Your Honor.

12             THE COURT:  Ms. Little Dog didn't testify or refute

13     that, Ms. Cross Guns didn't cross examine regarding that

14     point.  So, I think that's established.

15             MR. DAKE:  I agree.  Yes, Your Honor.  I was just

16     clarifying the point of the warrant, of whether or not they

17     would have, at that point, had the ability to get one.

18             THE COURT:  No, I understand.  The question of

19     whether they could have gotten a warrant the first time.

20     They asked for consent, and they got it, so they didn't need

21     a warrant.

22             MR. DAKE:  Yes, Your Honor.  And then --

23             THE COURT:  Okay.  Go ahead.

24             MR. DAKE:  -- the -- the testimony from Deputy

25     Bryce was that when they came back to the house, he, again,

1    knocked.  He only had to knock one time.  Ms. Little Dog,

2    again, came to the door, opened the door for him.  He

3    followed her, again, inside, to the same living room, and he

4    testified that he told her, Ms. Little Dog, we think there is

5    something more in this house, we think that there is a

6    crawlspace, to which she said there is not a crawlspace, go

7    look.

8              THE COURT:  Well, so, Mr. Bryce testified, from my

9    notes, that he and Mr. Zahaczewsky returned.  He explained

10   that they felt they had missed something in the first search.

11   He testified that no one had guns drawn at that point.  He

12   testified that Ms. Little Dog denied the existence of a

13   crawlspace in the house.

14        Do you agree with all of that?

15             MR. DAKE:  Yes, Your Honor.

16             THE COURT:  Okay.  He testified that he asked Ms.

17   Little Dog as to whether there -- he pointed out the vent in

18   the floor behind her wheelchair.  Do you recall that

19   testimony?

20             MR. DAKE:  Yes, Your Honor.

21             THE COURT:  All right.  And, then, Mr. Bryce

22   testified that Ms. Little Dog stated that the hatch -- he

23   asked her about a hatch to the crawlspace, and she said it

24   must be in the kids' room.  And Mr. Bryce testified that the

25   agents went to the kids' room, found the hatch in the corner

1    of the closet.

2         MR. DAKE:  Yes, Your Honor.

3         THE COURT:  I don't recall testimony about her

4    saying go ahead and look for a hatch, go ahead and search my

5    crawlspace.  Was it there?

6         MR. DAKE:  I don't think they said -- the words

7    weren't go ahead and look, Your Honor.  I believe, in the

8    testimony, that it was Deputy Bryce saying that when he

9    expressed that, regarding the crawlspace, she said something

10   to the extent of go look.  And I believe that was what his

11   testimony was here.

12        THE COURT:  Well, I'll check the transcript about

13   that.  I won't hold you to who took better notes.  You asked

14   Mr. Zahaczewsky several times, and Mr. Bryce several times,

15   you said at any point did Ms. Little Dog tell you to stop

16   searching.  Do you recall those questions?

17        MR. DAKE:  Yes, Your Honor.

18        THE COURT:  All right.  And they always answered

19   that she never did tell them to stop searching.

20        MR. DAKE:  Yes, Your Honor.

21        THE COURT:  All right.  So, my concern is did Ms.

22   Little Dog give affirmative consent for the second search?

23        MR. DAKE:  I believe she did, Your Honor.  And I

24   believe the record reflects that.  It reflects it not only in

25   the explicit consent that she gave when she said, "Go look,"

1    or however it appears in the transcript, Your Honor, of what

2    Deputy Bryce said, but, then, as well as the consent that she

3    gives by accompanying law enforcement to the back of the

4    room.  She --

5              THE COURT:  Well, wait a second.  You -- put

6    yourself in Ms. Little Dog's position.

7              MR. DAKE:  I'm sorry, Your Honor?

8              THE COURT:  I said put yourself in Ms. Little Dog's

9    position for a moment.  You've got two agents in your

10   house -- I'll check the transcript, I don't know what

11   happened -- they take off for the bedroom.  Are you going to

12   sit -- going to stand or sit in the living room, or are you

13   going to follow them and see what they are doing in your

14   house?  Well, is that an indicia of consent, the fact that

15   she follows the agent?

16             MR. DAKE:  No, Your Honor, but I think it further

17   supports the consent.  She didn't follow the agents down in

18   the first search, Your Honor.

19             THE COURT:  So, there were half a dozen of them in

20   the first search.

21             MR. DAKE:  Your Honor --

22             THE COURT:  Who is she supposed to follow?

23             MR. DAKE:  Well, I believe there were only three,

24   besides Deputy Bryce, who were inside of the --

25             THE COURT:  Okay.

```
 1              MR. DAKE:  Inside of the house, Your Honor.

 2              THE COURT:  I exaggerated.

 3              MR. DAKE:  Thank you, Your Honor.  But I believe

 4   what happened at that point is that once she had said it is

 5   in this back bedroom, she accompanied them to that back

 6   bedroom.  And I think that shows that she is consenting, and

 7   saying, yes, go ahead and look in this back bedroom, I'm

 8   coming with you.

 9              THE COURT:  She is either consenting, or resigning

10   herself to the fact that they are going to look.

11              MR. DAKE:  And, quite frankly, Your Honor, we don't

12   have the testimony to support either side of that, Your

13   Honor.  And, so, the inference would be, quite frankly, that

14   she is going with them to accompany them during the search of

15   this residence.

16              THE COURT:  Is an inference sufficient consent to

17   justify a warrantless search?

18              MR. DAKE:  It is, combined with what she told

19   Deputy Bryce, yes, Your Honor.

20              THE COURT:  All right.  I'll have to look at the

21   transcript more carefully about what she told Mr. Bryce.

22        Go ahead.  I jumped into your argument early.

23              MR. DAKE:  Well, and I'm not even sure, quite

24   frankly, that the argument regarding consent is -- given the

25   cross-examination and what was done in the briefing, that
```

1    consent aspect is the issue.  The issue more so being whether

2    that consent was coerced, or whether or not there was,

3    basically, without an ability to say no.  And I think that

4    might be more of the issue, quite frankly, Your Honor.

5            THE COURT:  Well, I mean, the purpose of this

6    hearing, Mr. Dake, is to develop a factual record on which I

7    can evaluate the totality of the circumstances to determine

8    whether Ms. Cross -- Little Dog voluntarily consented to the

9    search.  That's one possible exception to the warrant that

10   the agents admittedly did not have.

11           MR. DAKE:  Yes, Your Honor.

12           THE COURT:  All right.  The other purpose is to

13   determine, from those facts that were developed, whether

14   sufficient exigent circumstances existed to justify a warrant

15   to search by the agents.

16           MR. DAKE:  Yes, Your Honor.

17           THE COURT:  So, at some point -- you know, I don't

18   think you can fall back on, well, no one argues against

19   consent in the briefs.  The burden is on the government to

20   show that the search was valid.  A warrantless search,

21   presumptively, is invalid, unless a couple of circumstances

22   apply.

23       So, I need to look at the record for a valid -- of proof

24   that the -- that Ms. Little Dog gave her consent to the

25   search, don't I?

 1          MR. DAKE:  I agree completely, Your Honor.  And I

 2    believe -- but I believe that the consent was given in both

 3    of the two searches.

 4          THE COURT:  Well, we have -- the first search,

 5    we've got unrefuted testimony by Mr. Bryce that Ms. Little

 6    Dog states, "He isn't here.  You can look."  I'm not sure how

 7    much clearer you can get than that, "you can look."

 8          MR. DAKE:  Yes, Your Honor.

 9          THE COURT:  But I don't have notes to that kind of

10    testimony with regard to the second search.

11          MR. DAKE:  And, quite frankly, Your Honor, I can't

12    see what the transcript says.

13          THE COURT:  Right.  Well, we will deal with the

14    transcript.  But my question for you is, is that kind of

15    affirmative consent required, or can it be inferred through

16    shoulder shrugs or a lack of objection or --

17          MR. DAKE:  Your Honor, no, it can't be.  It's

18    not --

19          THE COURT:  So, if agents pound on the door and

20    say, "Federal agents, we are here to search, we are looking

21    for Mr. Gallardo," and if Ms. Little Dog said nothing and the

22    agents went in and did their search, would we have consent?

23          MR. DAKE:  I believe that would not, under those

24    circumstances --

25          THE COURT:  All right.  So, I agree that the first

 1    search, that we do have consent.  There is clear evidence,

 2    Mr. Bryce testified that Ms. Little Dog gave the consent.  We

 3    can set that out in the transcript, but I just wanted to

 4    clarify what the law would be.

 5         Go ahead, then.

 6              MR. DAKE:  And, so, I think that, on that point,

 7    Your Honor, consent has to be given under a totality of

 8    circumstances, but there has to be freely and intelligent

 9    consent given.  So I can't see --

10              THE COURT:  So, let me interrupt you again.

11              MR. DAKE:  Yes, Your Honor.

12              THE COURT:  All right.  You talked about whether

13    the consent was voluntary, that it's not coerced or

14    involuntary.

15              MR. DAKE:  Yes, Your Honor.

16              THE COURT:  But I think we have to have a consent,

17    first, then I -- then I look at the record, the second step

18    would be to look at the record and say, well, okay, she said

19    yes, but would that be voluntary if there were 20 guns in her

20    face, and overwhelming force, and whatever the circumstances?

21         And that we've got a factual record now there were a

22    couple of agents at the house, the -- Mr. Zahaczewsky had his

23    gun drawn, pointed downward, Mr. Bryce had his taser in the

24    same position, other agents were there, is -- does that

25    constitute sufficient coercion to overcome what looks like a

1      pretty clear consent?

2              MR. DAKE:  No.

3              THE COURT:  Why?

4              MR. DAKE:  It does not, Your Honor.  Well, I think

5      there is a couple of points that need to be addressed.  I

6      think that it's important -- it's not that this was a whole

7      slew of officers, this wasn't like a large SWAT operation

8      where they were busting into the house.

9          They were welcomed into the house, they opened the

10     door --

11             THE COURT:  Well, let's -- "welcomed" is kind of a

12     loaded term.  That would mean that there was -- you know,

13     that you're welcome, thank you, come in, please, glad to have

14     you here, as opposed to, okay, I'm not going to throw a fit

15     here.  Let's just use that the officers were allowed into the

16     house.  There are six -- there are eight of them on the

17     scene.

18             MR. DAKE:  No, Your Honor.  And that's why we

19     developed the record in the way that -- it wasn't eight on

20     the scene, Your Honor.

21             THE COURT:  Well, I'm talking about "the scene"

22     being two in the back, in the car, I'm sure securing the back

23     of the house, two in the front, and then Mr. Bryce and Mr.

24     Zahaczewsky doing the heavy lifting with the child, knocking

25     on the door, and then Mr. Connelly and -- who was the fourth?

 1    Mr. Salois?

 2              MR. DAKE:  I believe so, yes, Your Honor.

 3              THE COURT:  Okay.  So, those four were in the

 4    house, and then -- I think we had six in the house, finally,

 5    didn't we?

 6              MR. DAKE:  No, Your Honor.

 7              THE COURT:  Four at the door?

 8              MR. DAKE:  The fourth one came later.  It was the

 9    three who entered into the house, originally.

10              THE COURT:  Okay.  So, then --

11              MR. DAKE:  And then the fourth one came later into

12    the house, Your Honor.

13              THE COURT:  Three officers at the door with guns,

14    and you've got a car in front with two officers in it.  And

15    this neighborhood, this is East Glacier, I suspect you don't

16    routinely have police officers parked in front of your

17    house.

18              MR. DAKE:  I wouldn't think so.  Although, I

19    believe Special Agent Zahaczewsky said that there was an

20    unmarked police vehicle.

21              THE COURT:  Right.  I don't know if you're more

22    nervous seeing an unmarked car with two men sitting inside of

23    it versus a police car that might give you some feeling of

24    security.

25              MR. DAKE:  I'm not sure that you'd realized it was

 1     an officer's car.

 2              THE COURT:  Well, I think it was -- the presence of

 3     the officers might make me feel better than two unknown men

 4     sitting in an unmarked car in front of my house.

 5              MR. DAKE:  Yes, Your Honor.

 6              THE COURT:  That's when I call the Marshals

 7     Service.

 8              MR. DAKE:  Yes, Your Honor.

 9              THE COURT:  All right.  Well, so, why wouldn't Ms.

10     Little Dog's hospitality be forced?  This was -- you know,

11     she had no choice.  What was she going to do?

12              MR. DAKE:  I wouldn't classify it as hospitality,

13     quite frankly, Your Honor.

14              THE COURT:  I was using that in light of your

15     welcoming them into the house.

16              MR. DAKE:  Thank you, Your Honor.  I had a feeling.

17     I believe that when they sat down, the testimony from Deputy

18     Bryce was that she wasn't nervous.  She didn't appear

19     nervous.  And even on redirect, it was the same question,

20     these agents had guns that were out and they were searching

21     her house, she wasn't nervous about --

22              THE COURT:  Well, let's go back to the first

23     entry.

24              MR. DAKE:  Yes, Your Honor.

25              THE COURT:  I mean, once the agents are doing the

1    search of the rooms, you know, doing their formations, they

2    are already searching by then.  I think the two critical

3    points are allowing the officers beyond the threshold, and

4    then Mr. Bryce sits down with Ms. Little Dog, explains their

5    presence, and she says he's not here, go ahead and search.

6           You would agree that Ms. Little Dog could have stood in

7    the door and said don't you dare step foot in my house?

8               MR. DAKE:  Absolutely, she could have.

9               THE COURT:  All right.  Now, that would have been a

10   clear objection to their presence.

11              MR. DAKE:  Yes, Your Honor.

12              THE COURT:  All right.  Now, we have a somewhat

13   ambiguous acquiescence.  She opens the door inward.  I

14   believe Mr. Bryce -- or Mr. Bryce testified that he stepped

15   into the house as she stepped back to open the door.

16              MR. DAKE:  Yes, Your Honor.

17              THE COURT:  They are in.  That she didn't say get

18   out of here.

19              MR. DAKE:  No, Your Honor.

20              THE COURT:  All right.  But they are in.  Are they

21   invited in at that point?

22              MR. DAKE:  I believe that she was having the

23   conversation, as Deputy Bryce talked about --

24              THE COURT:  So, we are in the gray area there, I

25   think.  I mean, the critical -- so, the officers are in.

1    They are not really invited in yet, and she hasn't objected

2    to their presence.  Mr. Bryce explains the reason for their

3    being there.

4         MR. DAKE:  And I think that's why Special Agent

5    Zahaczewsky testified that he stood in the hallway area and

6    didn't move.  He didn't begin the search at that point.  He

7    waited until Deputy Bryce had spoken with Ms. Little Dog and

8    they had a conversation until what he believed --

9         THE COURT:  So, now, instead of three armed men at

10   the door, we have three armed men in your house.  Is that

11   more coercive?

12        MR. DAKE:  Well, I mean, at that point, as Deputy

13   Bryce testified, that he put his taser away when he was

14   entering into the living room and sitting down with her.

15   Agent -- Special Agent Zahaczewsky still had his gun out, and

16   Officer Connelly also had his gun out.  And I believe that

17   the testimony was that the other officer had not arrived at

18   that point.

19        THE COURT:  Okay.  All right.  Well, let's finish

20   up on the first search.  Anything else regarding any alleged

21   coercion on the first search?

22        MR. DAKE:  Your Honor, I think that you consider

23   the totality of what Ms. Little Dog was having with her

24   interaction with Deputy Bryce and what he described to the

25   Court as very cooperative.  And, in fact, somewhat out of

1   character for Ms. Little Dog.

2        And it's -- it doesn't suggest an individual who is

3   being coerced into allowing consent of her home.  Or nothing

4   in the record, quite frankly, Your Honor, that she ever asked

5   him to stop.

6        And as she -- as Special Agent Zahaczewsky testified to,

7   she has had interaction with law enforcement before.  During

8   her interview, she said that she had interactions with the

9   FBI before.  So, these --

10            THE COURT:  Well, Mr. Dake, I can sit up here and

11  be outspoken and aggressive in questioning, tough on people

12  in my courtroom, and that's the interaction that the public

13  has with me, or even the officers here; if those same

14  officers showed up at my house with guns drawn, I might be

15  very cooperative with them, because they have got their guns

16  drawn.

17        Would that -- how -- and Ms. Little Dog, I guess,

18  wouldn't be unique, as a politician, to be forceful, brash in

19  speaking out in her -- tougher in the public persona versus

20  how you react as a human when people show up at your house

21  with their guns drawn.

22            MR. DAKE:  Absolutely, Your Honor.  But I think

23  that there is distinctions.  It's not that she is the same

24  person in one spot or the other, but it is showing that she

25  has a knowledge of what law enforcement is and has the

1    ability to understand that maybe these individuals, I can

2    tell them no, and that she has had those sort of interactions

3    before.

4         So, I believe that that's why it's important in the

5    record to see that she has had that interaction with law

6    enforcement in the past.  And --

7              THE COURT:  So, how do I evaluate it?  Is it an

8    objective standard that --

9              MR. DAKE:  Absolutely, Your Honor.

10             THE COURT:  -- if Ms. Little Dog didn't have that

11   experience, she was a private person, a shut-in in her house,

12   had little contact with police or the public, would she be

13   held to a different standard in evaluating her consent versus

14   Ms. Little Dog?

15             MR. DAKE:  Well, I think what we are evaluating in

16   this instance, Your Honor, is the possibility of coercion.  I

17   think an individual who says, "Yes, you can search," it

18   doesn't matter the background of the person.  If they say,

19   "Yes, you can search," you can search.  That's the consent.

20        But I think where this is important is in the coercion

21   aspect of it, or whether or not she was coerced.  And I think

22   that that is where that fact comes into play, to show that

23   she has had that interaction with law enforcement before, and

24   she --

25             THE COURT:  Okay.

1          MR. DAKE:  So, it supports that she was not coerced

2     into giving consent.

3          THE COURT:  All right.  Well, let's turn to

4     exigency.

5          MR. DAKE:  Yes, Your Honor.

6          THE COURT:  All right.  What's -- what evidence in

7     the record do you believe supports the finding that exigent

8     circumstances justified this warrantless search?

9          MR. DAKE:  I think both prior to and during the

10    search, exigent circumstances were present.  So, prior to,

11    they began to see the defendant's background.  As you heard

12    the testimony regarding his criminal history, --

13         THE COURT:  Hold on.  The defendant is Ms. Little

14    Dog here.  You are talking about Mr. Gallardo, so let's be

15    clear for the record.

16         MR. DAKE:  Yes, Your Honor.

17         THE COURT:  You said, "The defendant's background."

18         MR. DAKE:  I'm sorry, Your Honor.  Thank you very

19    much.  Thank you for that clarification.  Yes, they reviewed

20    Mr. Gallardo's background.  Not the defendant's background.

21    They reviewed his background, because that's the individual

22    that they were searching for.  Saw that he had had various

23    criminal history --

24         THE COURT:  Well, I don't mean to beat that point

25    for a moment, but this is an important point.  If we are

1    searching Mr. Gallardo's house, and he's the one subject to

2    the arrest warrants and he gives consent, that's a whole

3    different analysis.  This is a third party, no criminal

4    history, as far as I know, no contact with law enforcement.

5    And if we are going to have agents going to her house to

6    conduct a warrantless search, I think we've got to be very

7    careful and make sure that we are following all of the

8    constitutional requirements.

9          MR. DAKE:  I agree, Your Honor.  I simply misspoke

10   at who I called the defendant.

11         THE COURT:  I know you did.  But I just wanted to

12   clarify the --  or use that opportunity to emphasize the

13   point.  This is a search on a third party's house.  The

14   standard is pretty high here.

15         MR. DAKE:  I agree, Your Honor.  And that's exactly

16   why we framed the issue as we did in our reply brief, was

17   simply that this is the issue, in a third-party search, in a

18   search of a third party's residence with only an arrest

19   warrant, it has to be with either consent or exigent

20   circumstances.

21         THE COURT:  All right.  So, I interrupted you.  Go

22   back to the exigency that you think was present.

23         MR. DAKE:  And, so, Mr. Gallardo's background, as

24   the Court was aware, and as explained to the Court.

25         There is also, then, the pending charges that were

 1    against Mr. Gallardo for abusive sexual contact with a minor.

 2         There is the FBI's statement.

 3         THE COURT:  You would agree that the evaluation of

 4    those exigencies, it's what the officers knew at the time.

 5         MR. DAKE:  It is, yes, sir.

 6         THE COURT:  They don't got to come in and say,

 7    well, gee, after I executed the search, we really researched

 8    this guy and found out all of these horrible things he had

 9    been doing.  It has to be what they knew at the time.

10         MR. DAKE:  Absolutely.

11         THE COURT:  And that's limited to Exhibit Number 1,

12    the wanted poster.  It's limited to Exhibit Number 2, the

13    NCIC record.  And Mr. Zahaczewsky testified that he had

14    conversations with an Agent Bennett, I believe, in South

15    Dakota?

16         MR. DAKE:  Yes, Your Honor.

17         THE COURT:  And Agent Bennett informed him of the

18    high-speed chase and the possibility of the firearm by Mr.

19    Gallardo.

20         MR. DAKE:  Yes.  Within the last month, yes, Your

21    Honor.

22         THE COURT:  All right.  Those three things.

23    Anything else?

24         MR. DAKE:  That was the previous.  That was what

25    they knew prior to going into this.

1          THE COURT:  All right.  Prior to the search.  When

2     they pull up to the house, that's what they know.

3          MR. DAKE:  Yes.

4          THE COURT:  All right.

5          MR. DAKE:  That is exactly right.

6          THE COURT:  All right.  Do any other exigencies

7     develop before they went into the house?

8          MR. DAKE:  Before they went into the house?

9          THE COURT:  Yes.

10         MR. DAKE:  Yes.

11         THE COURT:  What?

12         MR. DAKE:  When the child was out front who

13    identified Mr. Gallardo being there.  At that point, officers

14    knew that there was a child in the residence or near the

15    residence, they have an individual who was wanted on a sex

16    crime against a child.  So, at that point, exigency comes

17    into play, again.  Because if that child -- or if he has

18    access to that child, that's a very dangerous situation.

19         THE COURT:  Okay.  So, those four things.  Anything

20    else?

21         MR. DAKE:  I think it's also important to

22    recognize, as Deputy Bryce stated in his testimony, Ms.

23    Little Dog is in a wheelchair.  And, so, if an individual

24    were inside of her house and, perhaps, making her a hostage,

25    or hadn't made her a hostage at that point but had the

1    ability to, Ms. Little Dog may be limited in resources in

2    order to protect herself.

3              THE COURT:  Okay.  That's the first search.

4              MR. DAKE:  Yes, Your Honor.

5              THE COURT:  Because officers don't know, when they

6    are knocking, pounding on the door and Ms. Little Dog is not

7    answering, maybe Mr. Gallardo is threatening her or doing

8    something and telling her not to answer the door.

9              MR. DAKE:  Yes, Your Honor.

10             THE COURT:  That's your point.

11             MR. DAKE:  Yes, Your Honor.

12             THE COURT:  Okay.  Now, agents go in.  They search

13   the house, top to not quite the bottom, and they don't find

14   him.

15             MR. DAKE:  Yes, Your Honor.

16             THE COURT:  And they leave.  Okay?  So, now,

17   let's -- I think that their departure restarts the

18   analysis.

19             MR. DAKE:  I think to an extent, Your Honor, only

20   in the one -- and the reason that I say this is because his

21   criminal history doesn't go away, but he's --

22             THE COURT:  Oh, no, I agree.  But now we've got to

23   look at the second search.

24             MR. DAKE:  We do, yes, sir.

25             THE COURT:  I want to read you an excerpt from a

1    case.  This is United States versus Jones, it's 286 F.3d

2    1146, it's a Ninth Circuit opinion.  And, in that case, it

3    was do you have a consented search, whether it was voluntary.

4    And there was a prior -- you know, in that case, there was a

5    first entry that was deemed illegal, of whether the person

6    gave consent to the search.

7              MR. DAKE:  Yes, Your Honor.

8              THE COURT:  All right.  So, the Court of Appeals

9    was trying to decide whether that consent could be valid

10   because you've got this first one.  And the Court says, and

11   I'll quote here, "We have held that an illegal entry can

12   taint subsequent consent if the 'illegality is so connected

13   to the subsequent consent so as to render the consent

14   ineffective.'"

15        So, that isn't what we have here.  That's where the

16   officers kick in the door the first time, they search the

17   place, can't find it, leave, and come back and say, "Oh, by

18   the way, we believe we've missed something, can we please

19   come in?"  And the person says, "Well, okay."  And that's not

20   what we have here.  I understand that.  I'm not suggesting

21   that.

22        Then the next part I want to talk about is the court

23   goes on to say, "In such a case, a person might reasonably

24   think that refusing to consent to a search of his home, when

25   he knows that the police have, in fact, already conducted a

1    search of the home, would be a bit like closing the barn door

2    after the horse is out."

3                 MR. DAKE:  Yes, Your Honor.

4                 THE COURT:  What's your reaction?  I mean, here,

5    we've got -- in this context, we've got, arguably, a consent

6    to the first search different than what we have here.  But

7    then we come back for a second search, and is Ms. Little Dog

8    thinking to herself, well, I've already consented once, can I

9    say no?

10                MR. DAKE:  Well, I think we are back to the consent

11   aspect and away from the exigency for the moment, then, Your

12   Honor.

13                THE COURT:  Okay.  Well, tell me what you say --

14   that gets us back to the transcript review that we are going

15   to do.

16                MR. DAKE:  Yes, Your Honor.

17                THE COURT:  And then that's a question that I can

18   resolve.  What exigent circumstances existed for the second

19   search?

20                MR. DAKE:  I think it's the same exigent

21   circumstances.

22                THE COURT:  Okay.  So, let's go -- Exhibit Number

23   1.

24                MR. DAKE:  Yes, Your Honor.

25                THE COURT:  The wanted poster.

 1          MR. DAKE:  Yes, Your Honor.

 2          THE COURT:  Armed and dangerous, sex crime.

 3  Exhibit Number 2, Mr. Gallardo's NCIC record.

 4          MR. DAKE:  Yes, Your Honor.

 5          THE COURT:  Several assault-type behaviors.  The

 6  third thing was the conversation Mr. Zahaczewsky had with

 7  Agent Bennett in South Dakota, and the high-speed chase and

 8  the possibility of a firearm.

 9      The fourth thing, we still have the child there.

10          MR. DAKE:  Yes, Your Honor.  All of those, yes.

11          THE COURT:  Okay.  What about the idea of Mr.

12  Gallardo holding Ms. Little Dog hostage or threatening her?

13  Has that now evaporated?  They've already been -- they have

14  searched the house, no one's holding any weapons to her

15  telling her to be quiet or anything like that.

16          MR. DAKE:  I don't think it's evaporated, Your

17  Honor, but I think it still, obviously, would be a

18  consideration.  But then as soon as they knocked on the door

19  and she answered the door, that would, then, have gone away.

20  That exigency component of her being a hostage at that point

21  would go away.

22      However, it would still exist had they determined at

23  that point and she had said, well, no, you are not going to

24  search and you've got to get out of here.  Then, I think that

25  that comes back into play.  Because had she made law

1    enforcement leave at that point to go get a warrant, now she

2    is back susceptible to an individual who is in her house.

3        So, I believe that it turned off for the moment when she

4    answered the door and showed that she was fine; but, at the

5    same point, had she said no, and they would have left the

6    house, then that exigency goes back up again.

7            THE COURT:  Well, you have to -- that exigency

8    would go back if you're suggesting that Mr. Gallardo was

9    standing somewhere else in the house and telling Ms. Little

10   Dog, "Don't let them in, don't let them in."

11           MR. DAKE:  Well, not necessarily, Your Honor.  She

12   could have answered the door in the exact same way.  I think

13   we are speaking in hypotheticals here, and so I'll address

14   them as a hypothetical, where she answers the door, allows

15   them to come in --

16           THE COURT:  Unlike Mr. Bryce, you have to answer

17   hypothetically.

18           MR. DAKE:  I do, yes, Your Honor.

19           THE COURT:  I'm posing it to you, I am going to

20   make you answer it.

21           MR. DAKE:  I do.  She opens the door, and she

22   allows the officers to come in, and then she says, no, I

23   don't want you staying here, you're not going to search

24   again, go get a search warrant and I'll see you later.  And,

25   so, they are going to have to leave at that point.

```
 1        At that point let's say Mr. Gallardo comes upstairs from
 2   the crawlspace, and he says, "Who was that?"  And she says,
 3   "It's law enforcement, they are going to go a get warrant,"
 4   now she could be in a position where he becomes -- puts her
 5   in a hostage situation or he says -- quite frankly, Your
 6   Honor -- or where he says to her, "You know what?  No, they
 7   are not going to come back here, and now you're my hostage.
 8   Now I've got a gun to you and" --
 9        THE COURT:  Presumably, at that point, if he had
10   any brains he would have left.
11        MR. DAKE:  Say what, Your Honor?
12        THE COURT:  Presumably, in your hypothetical, if he
13   had any brains he would have left at that point, if she said
14   they are getting a warrant.
15        MR. DAKE:  Well, he may not have had a -- I mean,
16   we are getting, maybe, far afield.
17        THE COURT:  My offenders are a little more
18   intelligent than yours, but --
19        MR. DAKE:  I'll note that.  Thank you, Your
20   Honor.
21        THE COURT:  Okay.  So, that's -- those are the
22   indicia of exigency for the second search.
23        MR. DAKE:  Yes, Your Honor.
24        THE COURT:  Okay.  All right.  I just wanted to
25   flesh out all of those factors.  All right.  Anything else
```

1    about either search?

2         Oh, one more question that I have.

3              MR. DAKE:  Yes, Your Honor.

4              THE COURT:  What do I do with Mr. Bryce's statement

5    somewhere along the lines of, Cheryl, open up or I'm going to

6    kick in the door?  I think that's the sanitized version.

7              MR. DAKE:  Yes, I think that's exactly how he

8    stated it.  Before the first search, you mean, Your Honor,

9    correct?

10             THE COURT:  Yes.  So, I guess, how does that weigh

11   into the coercion analysis?

12             MR. DAKE:  And I think that Ms. Cross Guns will

13   argue that it does factor heavily into a coercion, in that

14   law enforcement knocks on the door and then says that they

15   are going to kick it in.  I think it's important not to

16   overlook that they had already knocked three times,

17   identified themselves, and said this is -- this is law

18   enforcement, let us in.

19        This is not a situation where the door was kicked in,

20   which is typically where coercion is seen, where law

21   enforcement comes to a house, kicks in the door, and then

22   asks, hey, can we search your apartment or you house, and

23   then they consent.  That's where the coercion is.

24        All that he said was a fact, quite frankly, Your Honor,

25   which was we are knocking on the door, if you don't respond

```
 1    I'm going to kick it in.
 2              THE COURT:  Okay.  So, back to my case, this Jones
 3    case, there was an illegal re-entry.
 4              MR. DAKE:  Was that -- I believe that was an
 5    apartment case, Your Honor?
 6              THE COURT:  Well, I -- I don't have it committed to
 7    memory yet, but --
 8              MR. DAKE:  I can --
 9              THE COURT:  I'm trying to remember.  Let me just
10    give you the broad outlines.  There was an illegal entry.
11    The officers left, then they came back and said, "Oh, can we
12    come in and search?"  And the occupant said, "Okay," thinking
13    to themselves, well, they have already searched, what am I
14    going to do?
15         So, my question for you is if I were to determine --
16    this is a hypothetical.  If I were to determine that, in the
17    first search, the consent was coerced, what does that do with
18    respect to the second search?  Does that taint the second
19    search?  Even if the person consented?
20         Now, this is the barn -- the horse is already out of the
21    barn argument.
22              MR. DAKE:  Yes, Your Honor.
23              THE COURT:  Okay.
24              MR. DAKE:  I think -- oh, did you want me to
25    answer, Your Honor, or do --
```

```
 1              THE COURT:  Oh, was that your -- I thought that was
 2    your answer.
 3              MR. DAKE:  No, that wasn't my answer.
 4              THE COURT:  Oh, okay.
 5              MR. DAKE:  No, Your Honor.  I didn't know if that
 6    was -- if that was the question.
 7              THE COURT:  I was going to applaud you for your
 8    candor, but --
 9              MR. DAKE:  (Smiling)
10              MS. CROSS GUNS:  I thought it was an answer.
11              THE COURT:  Go ahead, Mr. Dake.
12              MR. DAKE:  No.  No, Your Honor, that wasn't my
13    answer.  I was trying to make sure I understood what you were
14    asking.
15              THE COURT:  Okay.
16              MR. DAKE:  As the Court is aware, there are two
17    separate searches; and what had happened during the first
18    search and what happens during the second search are not the
19    same thing.  She --
20              THE COURT:  You don't think that a coercive consent
21    in the first search could invalidate a -- or invalidate a
22    consent in the second case?
23              MR. DAKE:  I think that we would look at the two
24    searches separately, Your Honor.
25              THE COURT:  Really?
```

1          MR. DAKE:  Yes, Your Honor.

2          THE COURT:  All right.  So, we would have to have a

3     separate consent for each search.

4          MR. DAKE:  And I think that's exactly what the

5     Court has stated.  So, I think that it's -- it only -- the

6     logic makes sense that if we are looking for the consent in

7     both searches, we treat them as separate searches.

8          THE COURT:  Okay.  One other Ninth Circuit case I'm

9     going to discuss is United States versus S-H-I-V-U, Shivu,

10    1990, 920 F.2d 1423.  And the quote is, "Consent to a

11    warrantless search cannot be inferred from a failure to

12    object to officers' entry, where officers did not expressly

13    or impliedly request permission and where a defendant did not

14    expressly grant or refuse entry."

15       So, there is some concern here on that second search.

16    And I'll have to look at the transcript, but I'm just telling

17    you that for your purposes.

18          MR. DAKE:  And I don't disagree with that at all,

19    Your Honor, I just can't -- cannot recall what Deputy Bryce

20    testified to.

21          THE COURT:  Okay.

22          MR. DAKE:  As far as the second search.  The only

23    other point that I would make, Your Honor, is, quite frankly,

24    the inevitable discovery argument, and --

25          THE COURT:  Well, how does that factor in?  I mean,

1    that seems like it's almost too convenient, just, well, you

2    know, we would have found him, anyway.  You know, we got a

3    warrant, whatever, they didn't.

4              MR. DAKE:  Well, the -- absolutely.  But the

5    inevitable discovery argument, Your Honor, comes up in this

6    sort of a situation.

7              THE COURT:  Well, let me tell you why I'm concerned

8    about inevitable discovery.

9              MR. DAKE:  Yes, Your Honor.

10             THE COURT:  Up until the officers entered Ms.

11   Little Dog's house, and up until the point where Mr. Bryce

12   began to question her, I haven't seen anything to indicate

13   that Ms. Little Dog had committed any crime and that there is

14   a knowledge requirement of harboring a fugitive.  So, unless

15   the government has evidence that Ms. Little Dog had knowledge

16   of Mr. Gallardo's status as a fugitive before being informed

17   of that fact by Mr. Bryce, I don't know if she had committed

18   a crime.

19        So, the two crimes in the Indictment charge harboring a

20   fugitive; and from what I can glean from the Indictment, the

21   harboring a fugitive, the elements were satisfied once Ms.

22   Little Dog claimed that Mr. Gallardo was not there and

23   Mr. Bryce informed her that he was a fugitive.  And, so, that

24   took place after the officers got in the house.

25        Then the false statement charge, which happens, again,

1   she makes that false statement after the officers have

2   entered her house.  That's what really concerns me.  I mean,

3   I'm not a big fan of those false statement charges, when the

4   statement is in the course of the investigation.  As you

5   know, that statute was passed because people were submitting

6   false claims during the Civil War, and it's the same thing

7   that happened during the New Deal, you know, the government

8   is passing out money, let's make false claims, you've reached

9   that Exculpatory-No Doctrine.

10   So, these are pretty serious charges that take place

11   after the -- as a result of the officers entering into the

12   house.  If she had said, "No, don't come in," I'm not sure

13   she -- you could have gotten an Indictment.

14   MR. DAKE:  Well, and I think it's important, first

15   of all, Your Honor, that we didn't present all of the

16   evidence that we had about the officers' knowledge, today.

17   THE COURT:  You did or didn't?  I'm sorry?

18   MR. DAKE:  We did not.

19   THE COURT:  Okay.

20   MR. DAKE:  As to Ms. Little Dog's knowledge.

21   Because, quite frankly, that's not the purpose of this

22   hearing.  But officers had more knowledge about what she knew

23   about Mr. Gallardo, and when she knew about his criminal

24   status, prior to going to her home that day.  So, I believe

25   that that, combined with what they encountered at the home,

1    what their information was would have gotten them probable

2    cause to get a warrant.

3            THE COURT:  Give me another example where the

4    inevitable discovery doctrine applies.

5            MR. DAKE:  Where, I'm sorry, what, Your Honor?

6            THE COURT:  Where the inevitable discovery doctrine

7    would apply.

8            MR. DAKE:  In which sort of a context, Your Honor?

9            THE COURT:  Anything.  Give me a context.

10           MR. DAKE:  I think the context is simply as we see

11   typically see it, which is officers go in with exigent

12   circumstances and search a house, and the court later

13   determines that, no, that's not enough for exigent

14   circumstances.  But when you looked at it in the first place,

15   they knew that the person who had shot the guy at the car

16   dealership had ran into the house, and was inside the house

17   with the gun.

18       That would be probable cause for them to get inside the

19   house, but might not be exigent circumstances.  And, so, in

20   that case, had they gone in, searched the house, gotten the

21   gun, I think that the court could still find, no, you didn't

22   have exigency, get a warrant, you should have gotten a

23   warrant.  And then there was inevitable discovery, which is,

24   yeah, had we gotten a warrant we would have found that gun

25   inside the place that he had run into.

1            THE COURT:  For inevitable discovery to apply, must

2    the officers had established probable cause before they went

3    into the house?

4            MR. DAKE:  Can you rephrase your question?

5            THE COURT:  I didn't phrase that very well.  Okay.

6    We have the inevitable discovery doctrine.

7            MR. DAKE:  Yes, Your Honor.

8            THE COURT:  And the example that you gave was that

9    somebody went into a house.  And the officers went in

10   thinking they had exigent circumstances, the court says, no,

11   they didn't.  But they would have inevitably discovered the

12   evidence, because they could have gotten a warrant based upon

13   probable cause.

14           MR. DAKE:  Yes, Your Honor.

15           THE COURT:  All right.  So, my question is in order

16   for inevitable discovery to apply, would it have to be a

17   situation in which the officers could have gotten a warrant

18   based upon probable cause?

19           MR. DAKE:  I think it has to be, yes, Your Honor.

20           THE COURT:  All right.

21           MR. DAKE:  That that's --

22           THE COURT:  All right.  But I thought you admitted

23   earlier at the time of the first search the officers had not

24   yet established probable cause.

25           MR. DAKE:  At the time of the first search?

1          THE COURT:  Yeah.

2          MR. DAKE:  I believe that they wouldn't have.  But

3    inevitable discovery comes in.  We are treating the two

4    searches separately.  So, inevitable discovery would have

5    come in in the second search.

6          THE COURT:  How?

7          MR. DAKE:  Because --

8          THE COURT:  Where was probable cause established by

9    the first search?  They didn't find anything.

10         MR. DAKE:  They did not find anything, Your Honor.

11   But, I think, combined with what they believed in the

12   house -- what they believe the last area was that they hadn't

13   checked in the house, they had not talked to that child yet

14   who was in front of the house who said, yeah, that guy is

15   inside of the house.  So, that would have gone to their

16   probable cause that they didn't have when they entered the

17   house the first time.

18         THE COURT:  Okay.  All right.  Anything else you

19   want to add?

20         MR. DAKE:  (Viewing documents)  No, thank you, Your

21   Honor.

22         THE COURT:  All right.  Thank you, Mr. Dake.

23         MR. DAKE:  Thank you, Your Honor.

24         THE COURT:  Ms. Cross Guns.

25         MS. CROSS GUNS:  Thank you, Your Honor.  This is an

1    interesting scenario.

2              THE COURT:  Do you agree that -- you heard

3    Mr. Bryce testify about what Ms. Little Dog said about the

4    first search?

5              MS. CROSS GUNS:  Yes.

6              THE COURT:  That, "He's not here.  Go ahead and

7    look."  You heard that?

8              MS. CROSS GUNS:  I heard it.

9              THE COURT:  All right.  You didn't -- it's

10   unrefuted.

11             MS. CROSS GUNS:  It's unrefuted.  (Indicating)

12             THE COURT:  Okay.  That's what he claims she said.

13   So, with the first search, are we looking, then, solely at

14   coercion?

15             MS. CROSS GUNS:  Yes.

16             THE COURT:  You agree that she said he's not here,

17   go ahead and search.  There is no -- nothing for me to

18   believe that didn't happen.

19             MS. CROSS GUNS:  There is nothing to believe that

20   didn't happen.  But he also testified that he said -- first,

21   he said that -- Agent Mark, because I can't say his last

22   name --

23             THE COURT:  Zahaczewsky.

24             MS. CROSS GUNS:  Zahaczewsky.

25             THE COURT:  Yeah.

1          MS. CROSS GUNS:  He --

2          THE COURT:  It's Polish.

3          MS. CROSS GUNS:  -- knocked lightly.  That was

4    Bryce's testimony, that he didn't knock very loudly.  And

5    then Deputy Bryce banged hard.  He says, himself, banged

6    hard, and he said, "If you don't open the door, I'm going to

7    kick it in."

8          Now, is a person required to open the door to these

9    guys?  Are they required to open the door to see what they

10   want?  I don't know.  (Shakes head negatively)  They didn't

11   say, "We have a warrant to search your house," because they

12   didn't have a warrant to search her house.  But they offered

13   to kick the door in.

14         And then when she opens the door, Detective -- or Deputy

15   Bryce testifies that he's got his taser right here

16   (indicating), and Zahaczewsky is right behind him with a

17   weapon, a gun right here (indicating), and another officer

18   behind him with a gun (indicating).  Come in.

19         And I think that's one of the --

20         THE COURT:  All right.  So, three officers are in

21   the house.

22         MS. CROSS GUNS:  Yep.  With guns.

23         THE COURT:  Mr. Bryce testified that he knelt down

24   next to Ms. Little Dog, explained the reason for their being

25   there, explained Mr. Gallardo's criminal history.

```
 1              MS. CROSS GUNS:  Sure.

 2              THE COURT:  Explained Mr. Gallardo's outstanding

 3   warrant.

 4              MS. CROSS GUNS:  (Nods head affirmatively)

 5              THE COURT:  And asked if he were there.  Mr. Bryce

 6   testified that Ms. Little Dog said, "He was here."

 7              MS. CROSS GUNS:  (Nods head affirmatively)

 8              THE COURT:  So, this isn't something out of left

 9   field.

10              MS. CROSS GUNS:  Right.

11              THE COURT:  "He was here, but he left.  He left

12   Wednesday."

13              MS. CROSS GUNS:  Correct.

14              THE COURT:  He's not here, go ahead and search.

15              MS. CROSS GUNS:  Correct.

16              THE COURT:  All right.  So, why is that coercive?

17              MS. CROSS GUNS:  Well, he didn't kneel down, he sat

18   down next to her.

19              THE COURT:  All right.

20              MS. CROSS GUNS:  And he stayed there with her while

21   the rest of the officers are going through her house

22   searching.

23              THE COURT:  Well, the testimony --

24              MS. CROSS GUNS:  That's --

25              THE COURT:  The testimony was that Mr. Zahaczewsky
```

1    waited in the hall --

2              MS. CROSS GUNS:  Uh-huh.

3              THE COURT:  -- until he heard Ms. Little Dog say

4    he's not here, go ahead and search.

5              MS. CROSS GUNS:  I understand.

6              THE COURT:  So --

7              MS. CROSS GUNS:  With his weapon drawn.  And I

8    think that's one of the --

9              THE COURT:  But they are not ransacking the house,

10   they are standing there waiting.

11             MS. CROSS GUNS:  I -- that's correct.

12             THE COURT:  So, where is the coercion?

13             MS. CROSS GUNS:  They talk about -- the government

14   talks in their own brief about voluntariness, and it's got a

15   five-part test.  And one of those tests is whether the

16   arresting officers -- or the searching officers, in this

17   case, had their guns drawn.  Because that creates a great

18   deal of fear.

19       I'm not sure that I would have done anything

20   differently, and I am pretty knowledgeable about the law.  If

21   you are going to kick my door in, and you are going to come

22   in with guns, Okay, go ahead and look.  Go ahead and look

23   (indicating)."  So --

24             THE COURT:  Do you have any case law -- what case

25   would you point to that most supports your decision?  Say,

1    look, here's an analogous set of facts, this case is on all

2    fours with Ms. Little Dog's situation.

3             MS. CROSS GUNS:  And I don't know that we have an

4    all-fours, in every corner.  I do --

5             THE COURT:  Give me three.

6             MS. CROSS GUNS:  (Laughing)  Well, I think -- in my

7    opinion, all of the cases that I cited to, even starting with

8    Katz.  And the question is reasonableness.  If it's

9    unreasonable to believe that you're allowing the search

10   because somebody is threatening to kick your door in and they

11   come in with guns drawn, I think that's reasonableness.

12            THE COURT:  Well, but don't I have to evaluate the

13   reasonableness in the context of the circumstances?

14            MS. CROSS GUNS:  Yes.

15            THE COURT:  We have got a fugitive wanted on a

16   serious felony charge involving the sexual abuse of children.

17   The officers are told by an agent in South Dakota that we had

18   a high-speed chase, the fugitive escaped, that he may have a

19   weapon.  That's what they know going in.

20            MS. CROSS GUNS:  Sure.

21            THE COURT:  So, is it unreasonable for a force of

22   three or four officers, who show up at the door, to go and

23   start looking for that person?

24            MS. CROSS GUNS:  I don't know if that's

25   unreasonable.  What I do know is that, you know --

1          THE COURT:  Well, that's -- if you don't know, how

2     do I know?  Tell me what it is.  If you don't think it's

3     unreasonable, then I won't.

4          MS. CROSS GUNS:  Well, like I said, even looking at

5     the government's cases, they talk about what is reasonable.

6     Okay, they show up at the door, what if Cheryl hadn't opened

7     the door?  And they kicked the door in, and came in, and they

8     found nothing?  Just like they did, they found nothing.

9          THE COURT:  Then Ms. Little Dog has a claim against

10    the government that they did damage to her property.

11         MS. CROSS GUNS:  Yeah.

12         THE COURT:  And, maybe, a claim against the

13    officers for a violation of her constitutional rights.

14         MS. CROSS GUNS:  Right.

15         THE COURT:  But that's not what happened.

16         MS. CROSS GUNS:  No.  But I do think they are still

17    in violation of her constitutional rights because they

18    offered to kick it in.  Look, she is in a wheelchair.  She

19    can't defend herself against somebody kicking her door in.

20    She can't defend herself against guns and tasers, so, yeah,

21    she is going to back up.

22         THE COURT:  Well, Mr. Bryce and Mr. Zahaczewsky

23    both testified that we didn't know, you know, we didn't know

24    whether Mr. Gallardo was inside the door prohibiting her from

25    answering it, striking her if she answered it.  We didn't

1    know.  This was a fast-flowing situation.  We are making

2    decisions on the go.  Why should I second-guess that?

3              MS. CROSS GUNS:  I think they were fast moving to

4    their own impetus.  Not because there was something there.

5    Here is a little child that they say they question, then they

6    say --

7              THE COURT:  Are you doubting that they questioned

8    him?

9              MS. CROSS GUNS:  No, no.  I'm not doubting that at

10   all.  They say, "Is this guy in here?"  Do they ever say,

11   "Does he have a gun?"  "Is he holding anybody hostage?"  Any

12   of those, sort of, more exigent questions, that we have an

13   emergency here, we have to kick the door in.  The kid comes

14   out, they don't say he's upset and he's worried, or he's

15   frightened or he's running away, so I don't see that

16   connection there that says, oh, now we have to be afraid,

17   because there is a small child coming out of the house.  I

18   don't see that escalation.

19             THE COURT:  You wouldn't think that the presence of

20   an alleged sex offender in the home of a six-year-old child

21   would cause concern?

22             MS. CROSS GUNS:  I think it should cause concern.

23   But I don't think it should cause people to be kicking down

24   the door when the kid is just leaving.  If that -- if they

25   are concerned, why don't they take the kid and say, "Have you

1  been molested by this guy?  Is he trying to take" --

2          THE COURT:  Well, wait a second.  Before we can --

3  wouldn't it be more prudent to secure the fugitive first

4  before we ask the kid those questions?  I mean, --

5          MS. CROSS GUNS:  (Indicating)  (Shakes head

6  negatively)

7          THE COURT:  -- after we waste all of the resources

8  and time interrogating a six-year-old and the fugitive runs

9  out the back door.

10         MS. CROSS GUNS:  Well, they had plenty of officers.

11 I don't think he would have run out the door.  You know?

12         THE COURT:  Okay.  So, that was one factor.  But

13 the child confirmed the presence of this -- of Mr. Gallardo

14 in the house.

15         MS. CROSS GUNS:  Yes.

16         THE COURT:  So, the officers -- and they have a tip

17 from an anonymous source.

18         MS. CROSS GUNS:  Yes.

19         THE COURT:  Now we've confirmed that he's in the

20 house.  And along with the other factors that they know,

21 we've got Exhibit 1, the wanted poster; Exhibit 2, the

22 criminal history; and the call with the agent in South

23 Dakota.  Now we've determined that the person in Exhibit 1

24 and Exhibit 2 and the call from South Dakota is, in fact,

25 here at the house.  Doesn't that heighten the exigency?

1        MS. CROSS GUNS:  I don't know that coming from a

2    small child, yeah, that's my grandma's boyfriend, he's in the

3    house, does that mean -- we don't have that exact language.

4        So, I don't know exactly what this boy said, he's been

5    in the house, he's in the house right now, they are having

6    breakfast, you know, I don't know what he said.  And I don't

7    know if the child means, well, he's been here, or does he

8    mean here right now?  I don't know.

9        THE COURT:  Uh-huh.

10       MS. CROSS GUNS:  And I don't know that we will ever

11   know for sure what happened there.  I don't doubt that there

12   are reasons to be concerned; but I also don't doubt that if

13   they had that kind of exigency, then they should have some

14   probable cause to get a warrant to go into the house.

15       And as you stated, and we've all stated, warrantless

16   searches are presumptively illegal.  And, okay, let's say

17   that they came in, they offered to kick the door down, they

18   got guns and all of that sort of thing, and they go through

19   and they find nothing, then they leave.  And not an hour

20   later, as is alleged in the brief, but less than ten minutes

21   later they come back.

22       Now, I don't believe the so-called exigencies have left,

23   but they don't come in with guns drawn.  So --

24       THE COURT:  (Laughing)  Well --

25       MS. CROSS GUNS:  And maybe they don't have to,

1  because they have already --

2          THE COURT:  Well, wait a second.  I mean, the guns

3  drawn goes to the coercive element, doesn't it?

4          MS. CROSS GUNS:  It does.

5          THE COURT:  The fact that the officers took a deep

6  breath the second search and said, well, we are not quite as

7  concerned.  I'm not sure I can hold that against them in

8  terms of coercion.

9          MS. CROSS GUNS:  Well, you don't have to have your

10  guns drawn.  It's sort of like -- it's sort of like domestic

11  abuse, okay?  So, she gets beat up enough times by the bad

12  guy and all of this sort of thing to where he just has to

13  look at her and she will say, okay, whatever you want.

14          THE COURT:  Okay.  Well, let's talk about --

15          MS. CROSS GUNS:  And --

16          THE COURT:  -- that for a second.  I mean, Ms.

17  Little Dog is a person of prominence in her community.

18          MS. CROSS GUNS:  Uh-huh.

19          THE COURT:  How does that factor into my analysis?

20  Would I look at an abused spouse differently in terms of a

21  voluntary consent versus Ms. Little Dog, for whom Mr. Bryce

22  testified holds her own in any situation?

23          MS. CROSS GUNS:  (Indicating)  You know, to a

24  certain extent there might be a difference.  But I don't

25  think when there are guns involved.  I'm a pretty

strong-willed person, too; but if somebody comes to my house,
and they have guns drawn, even if they are not pointed at me
I'm going to have a different response than I might have
under other kinds of circumstances.

Like in here.  I can argue with these guys, I can argue
with Logan.  I can argue away and be, as you said, very
assertive and very brash and very obnoxious.  But if somebody
has a gun, then I'm like, "Okay, yeah, come on in, look
around."

And then five minutes later they come back, and I do
think it's tainted at that point.  I think, at that point,
you know -- I think it was tainted from the get-go.  They
found nothing, they left, they came back five minutes later
and said we are going to look some more.  They can't do that
if they have a warrant.  They can't do it.  (Shakes head
negatively)  They shouldn't be allowed to do it here.

THE COURT:  Is there anything that would prevent
Ms. Little Dog from consenting twice?

MS. CROSS GUNS:  There is nothing, other than just
(nods head affirmatively) --

THE COURT:  So, you think that -- I understand that
if they had a warrant, that they needed a warrant for a
second search, unless she consents again.

MS. CROSS GUNS:  Yep.

THE COURT:  So, the question for me is did Ms.

1    Little Dog voluntarily consent on the second search?

2            MS. CROSS GUNS:  And I don't believe she did.  And

3    I don't believe -- I don't believe they have the facts.  And

4    I don't believe, given what happened in the first search,

5    that you can look at the second search the same way.  They

6    didn't have to come in with guns drawn, they were only gone

7    for five minutes.  And they come back, and everybody is

8    still, okay --

9            THE COURT:  Well, what about the -- the first

10   search, I think, as Mr. Zahaczewsky, I believe, testified,

11   that he saw a man's cowboy boots there.

12           MS. CROSS GUNS:  Uh-huh.

13           THE COURT:  That there was -- I don't know if there

14   are other -- I'll have to look at the record, but other

15   testimony about the presence of a man at the house.  Ms.

16   Little Dog testified -- or stated -- or told the officers

17   that Mr. Gallardo left, but, arguably, some of his belongings

18   might have been there, the cowboy boots could have been --

19   might still be here, why would he leave his stuff behind?

20           MS. CROSS GUNS:  Right.  There is only -- they are

21   only a pair of cowboy boots.  Because I did ask him, "What

22   was there?"  And if they have this, you know, pile of

23   clothing.  But what they find is a bra, not a pair of shorts

24   or anything like that.

25           THE COURT:  Okay.

1           MS. CROSS GUNS:  So, a pair of boots.  If he's got

2    more than one pair of shoes, and he's -- then he's jetting

3    out in the countryside or whatever he's doing, you know,

4    that's -- that, obviously, wasn't enough for them to continue

5    searching, the first search, to say what didn't we -- what

6    didn't we see?  They could have stayed right in the house and

7    consulted each other and said, "What are we missing?"  But

8    they didn't.  They left.

9           THE COURT:  Okay.

10          MS. CROSS GUNS:  So, let's see.  I would note,

11   also, that the guns that are drawn, they are not drawn in the

12   public setting of council meetings, they are not drawn in the

13   public setting of trainings and all of that.  So, I do think

14   that we have a very different scenario.  I do think -- I

15   think people would give consent under those circumstances,

16   even if they didn't want to give consent, or if they had

17   concerns about what was happening, you know, to their search

18   -- or to their home.  Excuse me.

19          THE COURT:  Ms. Cross Guns, back to the

20   reasonableness question.

21          MS. CROSS GUNS:  Sure.

22          THE COURT:  If the officers -- you know, four

23   officers show up with guns drawn investigating a traffic

24   ticket.

25          MS. CROSS GUNS:  (Smiling)

1          THE COURT:  That seems an unreasonable show of

2     force to me.

3          MS. CROSS GUNS:  (Nods head affirmatively)

4          THE COURT:  And designed to intimidate the

5     person.

6          MS. CROSS GUNS:  Right.

7          THE COURT:  But, here, don't I evaluate the

8     reasonableness in the context of the totality of the

9     circumstances, what the charges are, what the allegations are

10    against this person, and the danger to Ms. Little Dog, the

11    danger to the -- to her grandson, to other people in the

12    house and the community?

13         MS. CROSS GUNS:  (Nods head affirmatively)

14         THE COURT:  Isn't that the analysis I make?

15         MS. CROSS GUNS:  Well --

16         THE COURT:  I mean, that's one factor, right?

17         MS. CROSS GUNS:  That's one factor.

18         THE COURT:  Okay.

19         MS. CROSS GUNS:  I agree.  That's one factor.

20         THE COURT:  Okay.

21         MS. CROSS GUNS:  And, again, in their own briefs

22    they say, "Law enforcement is required to obtain a search

23    warrant for a third party's residence."  And I think you've

24    asked appropriate questions with regard to this is a third

25    party.  We are not looking at her criminal record, we are not

1    looking at exigent circumstances with regard to her.  Other

2    than she might be held hostage.  But if they are going to ask

3    the kid, "Is he in there," (indicating) maybe there should

4    have been another question before they offered to kick down

5    the door or come in with their guns ready (indicating) to

6    shoot somebody.  Uhm, that didn't happen.

7              THE COURT:  Okay.

8              MS. CROSS GUNS:  And I think it tainted the second

9    one.  They could have gone and got a warrant if they thought

10   they had some kind of probable cause to do that, but they

11   came back and said we are not done looking.

12             THE COURT:  I'm not sure they could have gotten a

13   warrant the second time, because it would be, well, we

14   searched the house, didn't find anything, we may have missed

15   something.

16             MS. CROSS GUNS:  Well, exactly.  And that is a

17   problem.  And it is a problem that bothers me.  The smell

18   test sort of doesn't work for me on this particular set of

19   facts.  Was the consent in the first search given freely?  I

20   don't believe it was.  Was it given intelligently?  That's a

21   different question.  Certainly, she is a political person,

22   knows about things like this.  But freely?  I don't think so.

23        I know that, you know, she and Logan know each other,

24   and know each other in a particular context, and I think that

25   may have led to some of that concern.  I don't know.  He --

1    she knows he knows what he is doing, and he's coming in, he's

2    going to kick my door down.  I know it hinges somewhat on

3    what the officers believed.  What did they reasonably believe

4    about her consent?  Was she giving consent?

5         She said, yeah, come and look, the first go-round.  The

6    second go-round, I don't have a crawlspace (indicating), he's

7    not here.  Did she consent?  Or was she like, oh, God, they

8    are back, and they still have guns.  Because you can see

9    them, you know, even if they don't have them drawn.  I just

10   think it doesn't pass the smell test.

11        And cooperation isn't part of that, so -- and letting

12   them through the door when they are offering to do harm to

13   the house and to the people in the house, I think, taints the

14   whole thing.

15             THE COURT:  All right.  Thank you, Ms. Cross

16   Guns.

17             MS. CROSS GUNS:  Thank you.

18             THE COURT:  I won't belabor the inevitable

19   discovery point, but -- you're finished, I assume, Mr. Dake?

20             MR. DAKE:  I'm sorry, Your Honor?

21             THE COURT:  You're finished, I assume?

22             MR. DAKE:  I am, yes, Your Honor.  Unless the Court

23   has something further.

24             THE COURT:  No, no.  I think we have developed a

25   record here.  I think I understand what the issues are.  I

1    think the witnesses that testified -- the record has been

2    developed here.  You can sit down, Mr. Dake.

3                MR. DAKE:  Thank you, Your Honor.

4                THE COURT:  I was just going to comment on some

5    things.  The inevitable discovery exception has some pretty

6    strict limits to it.  And you can look at the case law,

7    yourself.  So, I'm not going to belabor that point now as we

8    talked about it in terms of an order.  The trial in this case

9    is in June, Mr. Dake?  Is that right?

10               MR. DAKE:  It is, yes, Your Honor.

11               THE COURT:  June what?

12               MR. DAKE:  6th.

13               MS. CROSS GUNS:  6th.

14               THE COURT:  Okay.  I am going to take this case

15   under advisement.  I -- it's a very close case.  There is

16   some difficulties for both sides.

17        Mr. Dake, I'll have to look at the transcript about

18   consent -- about affirmative consent with regard to the

19   second search.  I'm concerned about an inference of consent,

20   well, she didn't object, and she said there was no

21   crawlspace, does that translate to go ahead and look around

22   my house?  I'm not sure that's the same thing.  That's a

23   concern that you have.  And I -- if I get past that, then the

24   inevitable discovery.  But there is limits on the inevitable

25   discovery's application.

```
 1        And then we can talk about exigency.  So, I think there
 2   were some exigent circumstances, certainly.  But, again, we
 3   are talking about a search of a third party's house, and I
 4   think the charges in this case developed chiefly during that
 5   search, the warrantless search of a third party's house.  So,
 6   I have some concerns about that.
 7        So, the government -- this is a totality of the
 8   circumstances analysis, so I'm going to look more carefully
 9   at the Ninth Circuit case law.  The -- and the transcript,
10   we'll get a copy of that and take a look at that.  Because I
11   don't recall testimony about affirmative consent on the
12   second search.
13        So, there is some weakness in the government's case.
14        Ms. Cross Guns, you have some weaknesses in your case,
15   certainly.
16              MS. CROSS GUNS:  Yes.
17              THE COURT:  We've got -- and you know what I'm
18   talking about.  Mr. Gallardo's status, and I won't belabor
19   the point, you know, we've got Exhibit 1 and Exhibit 2, the
20   call with the agents.
21              MS. CROSS GUNS:  Uh-huh.
22              THE COURT:  The identification by the grandson.
23   This is, again, totality of the circumstances.  I've got to
24   evaluate consent --
25              MS. CROSS GUNS:  (Nods head affirmatively)
```

```
 1              THE COURT:  -- in the context of the whole

 2    circumstances.  That includes Ms. Little Dog's position in

 3    her community, her previous dealings with law enforcement,

 4    her ability to stick up for herself.  And then I also have to

 5    evaluate exigent circumstances in those contexts.

 6         So, I'm going to take it under advisement.  It is a very

 7    difficult, close case, and I urge the parties to consider a

 8    resolution of it.  But I'll have an order out, I would say --

 9    today is the 28th?  I'll have an order out by May 12th.  And,

10    so, I can decide it by May 12, or you can figure it out for

11    yourselves.

12         All right.  Anything further, Mr. Dake?

13              MR. DAKE:  No, thank you, Your Honor.

14              THE COURT:  Mr. Rostad, do you have anything to

15    add?

16              MR. ROSTAD:  I don't, Your Honor.  Thank you --

17              THE COURT:  I'm sorry to hear that.

18              MR. ROSTAD:  Thank you for your hospitality

19    today.

20              THE COURT:  I understand that you are going to be

21    back a few times, though, before you leave permanently.

22              MR. ROSTAD:  Pardon me?

23              THE COURT:  I said that I understand that you will

24    be back a few times before you leave permanently.

25              MR. ROSTAD:  I hope so, Judge.  I hope so.
```

```
 1              THE COURT:  Have we figured out a time for our
 2    change of plea in the other case?
 3              MR. ROSTAD:  I'm working on it.  Unfortunately, I
 4    didn't get a response from my opposing counsel.
 5              THE COURT:  All right.  I have a --
 6              MR. ROSTAD:  But I will remind him.
 7              THE COURT:  I have a hole in my schedule that I
 8    can't get out of, I'm afraid.
 9              MR. ROSTAD:  We will do our best to get an answer
10    tomorrow.
11              THE COURT:  Okay.  Thank you, Mr. Rostad.  Nice to
12    see you.
13         Ms. Cross Guns, anything else?
14              MS. CROSS GUNS:  Nothing.  Thank you, Your Honor.
15              THE COURT:  All right.  So, we will have an order
16    out by May 12.
17              MR. DAKE:  Thank you, Judge.
18              THE COURT:  We will be in recess.  Thank you.
19    (Proceedings concluded at 4:27 p.m.)
20
21
22
23
24
25
```

1                              CERTIFICATE

2

3        I, Julie L. Sampson, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter to the best of my knowledge, skill, and

6    ability.

7

8
      /s/ Julie L. Sampson                  04/10/2017
9    Julie L. Sampson                       Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25